UNITED STATES of America,
Plaintiff–Appellant,

v.

William B. ELLEN, Defendant–Appellee.

UNITED STATES of America,
Plaintiff–Appellee,

v.

William B. ELLEN, Defendant–
Appellant.

Nos. 91–5032, 91–5033.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1991.

Decided April 2, 1992.

As Amended April 27, 1992.

Jane F. Barrett, Asst. U.S. Atty., Baltimore, Md., argued (Richard D. Bennett, U.S. Atty. and Ethan L. Bauman, Asst. U.S. Atty., on brief), for plaintiff-appellant.

Benjamin S. Sharp, Perkins, Coie, Washington, D.C., argued (Steven C. Tabackman, Donald C. Baur and Ira Dassa, on brief), for defendant-appellee.

Before ERVIN, Chief Judge, and RUSSELL and WILKINSON, Circuit Judges.

## OPINION

WILKINSON, Circuit Judge:

This case presents several issues pertaining to defendant's conviction for illegally discharging pollutants into wetlands in violation of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* Defendant appeals his conviction, and both defendant and the United States appeal the district court's application of the Sentencing Guidelines. We affirm both the conviction and the sentence.

I.

Defendant William B. Ellen received a degree of Bachelor of Science in Engineering from Old Dominion University in 1972. For the following four years, he was a staff environmental engineer with the Virginia Marine Resources Commission and was responsible for reviewing the regulation of certain wetlands projects. In 1976, Ellen formed William B. Ellen, Inc., which specialized in the design of, and acquisition of permits for, construction projects in tidal wetlands and subaqueous areas.

In August 1987, Ellen was hired by Paul T. Jones II to assist in the development of property on the Eastern Shore of Maryland into a personal and corporate retreat that would serve as a hunting preserve and wildlife sanctuary. Ellen advised Jones as to the acquisition of the property—named Tudor Farms—and, after the purchase, became the project manager responsible for land clearing, road construction, and pond excavation. Tudor Farms is low, wet land. It is surrounded on three sides by tidal waters and marshes, and the property itself contains large areas of wooded wetlands and tidal marshes and some upland fields and roads. Prior to the construction on the property, Tudor Farms served as habitat for an endangered species, the Delmarva fox squirrel, as well as an American bald eagle, various migratory birds, and wood ducks.

Ellen supervised extensive excavation and construction at the Tudor Farms site. Ellen admits that he was responsible for acquiring environmental permits and complying with the various state and federal environmental regulations. Indeed, throughout construction at Tudor Farms, Ellen made clear—to officials of the Maryland Department of Natural Resources, to the Dorchester County Highway Department, and to Army Corps of Engineers (Corps) enforcement officials, among others—that he assumed the responsibility for acquiring all needed environmental permits.

In February 1988, a Corps enforcement official visited the site, indicated to Ellen what could and could not be done without a

Corps permit, and issued a cease and desist letter that ordered Tudor Farms to stop filling wetlands. When Corps officials returned to the site in January 1989, they found several wetlands sites where work had progressed without the necessary permits. They instructed the site manager that all work in wetlands cease, but construction continued nonetheless. The Corps issued a second cease and desist letter on February 15. Upon visiting the site on March 3, Corps officials noticed additional violations. When Ellen refused to comply with their order to stop work, the Corps officials contacted the subcontractors directly, and only then did work cease. Upon learning that Ellen had not obtained all necessary environmental permits, Jones fired Ellen.[1]

Ellen was tried on six counts of knowingly filling in wetlands without a permit in violation of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A). He did not controvert the United States' allegations as to the construction activity that occurred at Tudor Farms. Instead, Ellen disputed two elements of the offenses alleged: that the areas where work occurred were wetlands and, if they were wetlands, that Ellen knew they were wetlands and that permits were required. The jury convicted Ellen on five of the six counts. The district court imposed a sentence of six months' imprisonment and one year of supervised release, with the latter conditioned upon four months' home detention and sixty hours of community service.

Both Ellen and the United States have appealed.

## II.

We pause briefly at the outset to describe the relevant statutory provisions. Congress enacted the Clean Water Act (CWA), 33 U.S.C. § 1251 *et seq.*, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* § 1251(a). To this end, the CWA pro-

hibits the discharge "of any pollutant to navigable waters from any point source" without a permit. 33 U.S.C. §§ 1311(a), 1362(12)(A). The CWA defines navigable waters as "the waters of the United States," *id.* § 1362(7), though it does not define the latter phrase. Both the Environmental Protection Agency (EPA), *see* 40 C.F.R. § 230.3(s)(2), (7) (1991), and the Army Corps of Engineers, *see* 33 C.F.R. § 328.3(a)(2), (7) (1991), define "waters of the United States" to include wetlands, and both define wetlands as follows:

[T]hose areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

40 C.F.R. § 230.3(t) (1991); 33 C.F.R. § 328.3(b) (1991). This regulatory definition has remained unchanged since 1977. *See* Proposed Revisions to 1989 Wetlands Manual, 56 Fed.Reg. 40,446, 40,446 (1991) [hereinafter Proposed Revisions].

Four federal agencies—EPA, the Corps, the Fish and Wildlife Service, and the Soil Conservation Service—are principally involved in the identification and delineation of wetlands. *See* Federal Interagency Committee for Wetland Delineation, *Federal Manual for Identifying and Delineating Jurisdictional Wetlands* 1 (1989) [hereinafter *1989 Manual*]. The Corps is authorized by CWA § 404 to issue permits for the discharge of dredged and fill materials into wetlands, *see* 33 U.S.C. § 1344(a), though both EPA and the Corps are responsible for making wetlands determinations under § 404. *See 1989 Manual, supra,* at 1. Prior to 1989, EPA and the Corps each developed its own procedures for identifying and delineating wetlands, which were set forth in technical manuals. *See* Environmental Protection Agency, *Wetland Identification and Delineation*

---

**1.** Jones subsequently pleaded guilty to one count of negligently filling wetlands. *See* 33 U.S.C. § 1319(c)(1)(A). He was placed on probation for eighteen months and ordered to pay a $1 million criminal fine and $1 million for restoration of the property to its original condition and to place 2500 acres of the property in a conservation trust.

*Manual* (1988); Environmental Laboratory, Dep't of the Army, *Corps of Engineers Wetlands Delineation Manual* (1987).

The absence of a uniform federal methodology resulted in inconsistent wetlands determinations for similar areas. *See* Proposed Revisions, *supra,* at 40,449. As a result of these inconsistencies, in 1989 the four federal agencies merged their methods and issued a single wetlands delineation manual, which provides a uniform national procedure for wetland determinations. *See 1989 Manual, supra.* Application of the *1989 Manual* resulted in a significant increase in lands identified as wetlands as compared with the EPA and Corps manuals. *See* Proposed Revisions, *supra,* at 40,450; S.Rep. No. 80, 102d Cong., 1st Sess. 54 (1991). In August 1991, the four agencies proposed a revised manual, application of which would result in fewer lands classified as wetlands than under the *1989 Manual. See* Proposed Revisions, *supra.*

### III.

Ellen argues that his conviction violated the Due Process Clause and the Ex Post Facto Clause. His argument under both clauses is essentially the same. The five counts for which he was convicted involved discharging pollutants from a point source in areas alleged to be wetlands. The United States was required to prove at trial that the areas in which the conduct occurred were, in fact, wetlands. Ellen concedes that the regulatory definition of "wetlands" promulgated by EPA and the Corps remained unchanged since the commencement of the charged conduct and was the definition included in the district court's instructions to the jury. The constitutional problems arise, according to Ellen, because some government witnesses at trial based their conclusions that the areas were wetlands on the more inclusive *1989 Manual,* while the conduct for which he was charged occurred in 1987 and 1988, before its promulgation. Ellen asserts that the district court's admission of such testimony permitted the jury to convict him on the basis of subsequently developed standards—which assertedly violates the non-retroactivity principle of the Ex Post Facto and Due Process Clauses.

For the reasons set forth below, we reject Ellen's ex post facto and due process arguments and therefore affirm his conviction.

### A.

■ The Ex Post Facto Clause provides: "No ... ex post facto Law shall be passed." U.S. Const., art. I, § 9. As the text of the Clause makes clear, the ex post facto prohibition applies only to "laws." Accordingly, "[t]he constitutional prohibition against ex post facto laws ... is directed to the legislative branch of government rather than to the other branches." *Prater v. U.S. Parole Comm'n,* 802 F.2d 948, 951 (7th Cir.1986) (*en banc*). This is not to say, however, that all actions of administrative agencies are exempt from Ex Post Facto Clause scrutiny. "When Congress has delegated to an agency the authority to make a rule instead of making the rule itself, the resulting administrative rule is an extension of the statute for purposes of the [C]lause." *Rodriguez v. United States Parole Comm'n,* 594 F.2d 170, 173 (7th Cir.1979). The reason for applying the Clause to such legislative rules is straightforward: Congress "should not be allowed to do indirectly what it is forbidden to do directly." *Prater,* 802 F.2d at 954. But when an agency promulgates an interpretive rule, the Ex Post Facto Clause is inapplicable. "[I]nterpretive rules simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties." *Jerri's Ceramic Arts, Inc. v. Consumer Product Safety Comm'n,* 874 F.2d 205, 207 (4th Cir.1989). Unlike legislative rules, which "ha[ve] the force of law," *id.,* interpretive rules "are statements of enforcement policy. They are ... 'merely guides, and not laws: guides may be discarded where circumstances require; laws may not.'" *Prater,* 802 F.2d at 954 (quoting *Inglese v. United States Parole Comm'n,* 768 F.2d 932, 936 (7th Cir.1985)). Whether the Ex Post Facto Clause applies in this case, therefore, de-

pends on whether the *1989 Manual* is a legislative rule or merely an interpretive guide.

 Ellen has presented no reasons why the *1989 Manual* is legislative rather than interpretive in nature, and we find no indication that promulgation of the *1989 Manual* was an exercise of the agencies' delegated legislative function. Rather, it seems clear that the four agencies that promulgated the *1989 Manual* intended it to be only an interpretive guide to the regulatory definition of wetlands, primarily for the use of agency personnel. The agencies have described the manual as "a technical guidance document" that "provides internal procedures for agency field staff for identifying and delineating wetlands." *Proposed Revisions, supra,* at 40,-446. The manual does not purport to "create[ ] new law or impose[ ] new rights or duties," *Jerri's Ceramic Arts,* 874 F.2d at 207, and it was not promulgated through the notice and comment rulemaking procedures of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.,* through which all legislative rules must pass. *See Jerri's Ceramic Arts,* 874 F.2d at 208. We conclude, therefore, that the *1989 Manual* is interpretive rather than legislative in nature and, as a result, it is not a "law" within the meaning of the Ex Post Facto Clause. Accordingly, Ellen's ex post facto argument is without merit.

### B.

 Ellen bases his due process argument on *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). In *Marks,* the defendants were convicted of the interstate transportation of obscene material. The convictions were based on the definition of obscenity announced in *Miller v. California,* 413 U.S. 15, 93 S.Ct.

2607, 37 L.Ed.2d 419 (1973), even though the conduct on which the convictions rested occurred while the narrower definition of obscenity in *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), governed. The Supreme Court held that application of the *Miller* definition violated the Due Process Clause because the defendants lacked "fair warning of that conduct which will give rise to criminal penalties." *Marks,* 430 U.S. at 191, 97 S.Ct. at 992–93. Ellen argues that this case is analogous to *Marks:* there the Court invalidated the use of a subsequently developed judicial interpretation of the statutory term "obscenity," whereas here the court should invalidate the use of subsequently developed administrative criteria for determining what property falls within the regulatory definition of "wetlands."

We believe that Ellen overreads the *Marks* decision. The essence of the due process argument in *Marks* was that the new interpretation of obscenity was unforeseeable. *See id.* at 192, 97 S.Ct. at 993. As the Court recently noted, *Marks* turned on the fact that, at the time of the conduct for which they were charged, "[t]he defendant[s] could not suspect that [their] actions would later become criminal." *Osborne v. Ohio,* 495 U.S. 103, 117, 110 S.Ct. 1691, 1700, 109 L.Ed.2d 98 (1990). Viewed in this light, Ellen's due process contention is without merit, for Ellen's argument that he lacked fair warning that the areas in question were wetlands is foreclosed by the jury's verdict. Ellen was convicted of five counts of "knowingly" filling wetlands without a permit. *See* 33 U.S.C. § 1319(c)(2)(A). Thus, the jury found, beyond a reasonable doubt, that Ellen *knew* that the areas named in the indictment were wetlands at the time that the work there was undertaken. If Ellen knew that these areas were wetlands, then he cannot claim that the criminal nature of his conduct was unforseeable.[2] The jury verdict

---

**2.** We reject Ellen's claim that the district court's instruction to the jury as to the definition of "knowledge" was erroneous. In its instruction, the court stated that the jury, in determining whether Ellen acted knowingly, "should consid-

er all the information you find was available to the defendant[ ]." Ellen argues that this allowed the jury impermissibly to convict on the basis of what a reasonable person in Ellen's situation should have known, rather than on

is clearly supported by substantial evidence, for the record is replete with indications that Ellen possessed actual knowledge that he was working in wetlands. As early as October 1987, for example, a civil engineer hired by Ellen to provide surveying assistance at Tudor Farms told Ellen that environmental maps indicated that Ellen was working or planning to work in wetlands and, as a result, a Corps permit was required. And in February and March 1988, Corps enforcement officials toured Tudor Farms with Ellen and indicated to him areas that were wetlands. On their March visit, the Corps officials actually tied survey ribbons on trees and bushes to indicate to Ellen how to minimize the impact of proposed construction upon wetlands. These and other warnings to Ellen involved core wetlands—areas that would qualify as wetlands under any definition of that term. His disregard of those warnings—and of subsequent cease and desist letters—undercuts any argument that he was unaware of the nature of the land under development.

In sum, because the jury's conclusion that Ellen possessed actual knowledge that he was filling wetlands is supported by substantial evidence, we must conclude that Ellen had fair warning that he was subject to the CWA's criminal penalties and

that his due process argument is without merit.

## IV.

We turn now to the district court's application of the Sentencing Guidelines. The district court based Ellen's sentence on a total offense level of twelve, which it calculated as follows. The base offense level was six. *See* U.S.S.G. § 2Q1.3(a) (1991). The district court then imposed a four-level upward adjustment for "an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment," *id.* § 2Q1.3(b)(1)(A), and a two-level upward adjustment because "the offense involved a discharge without a permit," *id.* § 2Q1.3(b)(4).[3] Ellen argues that the district court should not have applied § 2Q1.3 and challenges both enhancements; the United States challenges the district court's refusal to impose a two-level upward adjustment for the use of a special skill, *id.* § 3B1.3. We address these arguments in turn.

## A.

██ Ellen first argues that the district court should have disregarded § 2Q1.3 because it is inconsistent with the Guidelines' enabling legislation. The Sentencing Reform Act of 1984 directs the Sentencing Commission to "insure that the guidelines

what Ellen actually did know. We think that this is a cramped reading of the instruction. We do not read the instruction as allowing the jury to convict on the basis of a reasonable person standard. Rather, the instruction drew the jury's attention to Ellen's actual knowledge: The district court made clear that knowledge involves the "state of a person's mind" and that a conviction could not be based on the defendant's "ignorance." The court also stated that "the Government must prove that the defendant acted knowingly," that "[t]his requirement applies to all four elements of the offense," and that "[w]hether the defendant acted knowingly may be proven by the defendant's conduct, and by all the facts and circumstances surrounding the case." Thus, this case is quite unlike *United States v. Stephens*, 569 F.2d 1372 (5th Cir.1978), on which Ellen relies, for in that case the jury instruction explicitly contained a reasonable person standard, *see id.* at 1374. In sum, read as a whole, the instruction " 'fairly and adequately state[d] the pertinent legal principles involved' " and is not grounds for reversal.

*United States v. Dee,* 912 F.2d 741, 746 n. 8 (4th Cir.1990) (quoting *Hogg's Oyster Co. v. United States,* 676 F.2d 1015, 1019 (4th Cir.1982)).

We also reject Ellen's separate argument that the district court failed to instruct the jury that an element of the offense was that Ellen knew that a permit was required by the CWA. The district court instructed the jury that absence of a permit was an element of the offense, and it unambiguously stated that the United States had to prove that Ellen acted knowingly with regard to each element.

3. These enhancements involved guided downward departures from the Guidelines, which provide for a six-level adjustment under § 2Q1.3(b)(1)(A) and a four-level adjustment under § 2Q1.3(b)(4). This downward departure of two levels for each enhancement is authorized by the application notes, *see* U.S.S.G. § 2Q1.3, comment. (nn.4, 7) (1991), and has not been challenged on appeal by the United States.

reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). Ellen is a first offender who was not convicted of a crime of violence. The imposition of a sentence of imprisonment is consistent with the Guidelines' enabling legislation, therefore, only if filling wetlands without a permit is "an otherwise serious offense." Ellen asserts that his offense was not serious because it caused "no public health, welfare or safety threat, no public economic harm and no deprivation of public use or enjoyment." Because Guidelines § 2Q1.3 imposes a sentence of imprisonment for a non-serious offense, concludes Ellen, the district court should have declined to apply it.

This argument need not detain us long. Section 2Q1.3 does not contravene the Guidelines' enabling legislation because the Sentencing Commission acted well within its discretion in classifying the instant offense as a serious one. Through the Clean Water Act and other environmental laws, Congress has determined that harm to the environment—even absent imminent threats to public health, welfare, or safety—is a public policy concern of the greatest magnitude. In the CWA in particular, Congress determined that "the restoration of the natural chemical, physical, and biological integrity of the Nation's waters is essential," S.Rep. No. 414, 92d Cong., 2d Sess. 7 (emphasis added), reprinted in 1972 U.S.Code Cong. & Admin.News. 3668, 3674, and set a national goal of fully eliminating what Ellen did here: the discharge of pollutants into the waters of the United States. See 33 U.S.C. § 1251(a)(1). The importance of these goals is reflected in the heavy punishments Congress selected for knowing violations of the CWA: "a fine of not less than $5,000 nor more than $50,-000 per day of violation, or ... imprisonment for not more than 3 years, or ... both." Id. § 1319(c)(2). Ellen's actions caused the destruction of substantial habitat and of approximately 86 acres of environmentally critical wetlands—damage that will cost an estimated $1 million to remedy. That Ellen believes that an offense of this magnitude is trivial or unimportant ironically exemplifies the need not to foreclose punishment by imprisonment in enforcing laws aimed at environmental protection.

### B.

Ellen next challenges the district court's imposition of the upward adjustments for "ongoing, continuous, or repetitive" discharge of a pollutant, see U.S.S.G. § 2Q1.3(b)(1)(A) (1991), and for discharge without a permit, see id. § 2Q1.3(b)(4). He argues that the base offense for which he was charged had as elements discharge of a pollutant and discharge without a permit and that, as a result, imposition of the enhancements results in impermissible double counting.

■ Ellen's argument is foreclosed by precedent. As we recently noted, "[t]he Sentencing Commission plainly understands the concept of double counting, and expressly forbids it where it is not intended." United States v. Williams, 954 F.2d 204, 207 (4th Cir.1992). Because "the Guidelines are explicit when double counting is forbidden," id., "[a]n adjustment that clearly applies to the conduct of an offense must be imposed unless the Guidelines expressly exclude its applicability," id. at 207. Since by their terms both adjustments apply to Ellen's conduct, the district court did not err in applying the upward adjustments in U.S.S.G. § 2Q1.3(b)(1)(A) and (4).

In any event, those enhancements "rationally reflect[ ] the Guideline's graduated adjustment scheme." Williams, at 206. In this context as elsewhere, the Guidelines establish an "incremental adjustment schedule" that serves to advance "the Guidelines' fundamental goal of proportionality in sentencing." Id. at 207. Thus, the § 2Q1.3(b)(1)(A) enhancement differentiates punishment according to whether the discharge was "ongoing, continuous or repetitive" or occurred on only one occasion. Further, § 2Q1.3 applies to offenses that do not involve the discharge of a pollutant,

*see, e.g.,* 33 U.S.C. § 403 (prohibiting, *inter alia,* the obstruction of navigable waters); therefore, the § 2Q1.3(b)(1)(A) enhancement ensures that such offenses are treated less severely than are those involving such a discharge. Likewise, § 2Q1.3 applies to offenses not involving the failure to obtain a permit, *see, e.g.,* 33 U.S.C. §§ 409, 411 (requiring the marking and removal of sunken vessels), and the § 2Q1.3(b)(4) enhancement for discharge without a permit therefore functions to increase the penalty for those offenders who violate a permit requirement.

### C.

█ Finally, the United States argues that the district court erred in not imposing the upward adjustment for use of a special skill. The Guidelines provide an enhancement "[i]f the defendant ... used a special skill[ ] in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 (1991). Special skill is defined as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id.* § 3B1.3 comment. (n.2).

The United States urged the district court to apply the two-level enhancement of § 3B1.3, arguing that Ellen's extensive experience in wetlands construction and permit acquisition constituted a special skill that significantly facilitated the commission of the offense. The district court refused to apply the enhancement because it concluded that any special skills possessed by Ellen did not facilitate the commission of the offense. According to the court, Ellen simply failed to obtain a permit and, in this case, such inaction was not facilitated by any expertise he possessed. The government challenges this determination on appeal and characterizes the district court's ruling as creating an exemption to the special skills enhancement for defendants who commit regulatory crimes within the course of their professions.

We believe that the government misconstrues the district court's holding. Although the court did indicate that it could not conclude that special skills significantly facilitated an offense "simply because somebody in a regulated profession commits a regulatory offense," at no point did the court purport to create an exemption to the special skills enhancement. Rather, the court's decision not to apply the enhancement was based on its factual determination that any special skills possessed by Ellen did not facilitate his particular offenses. Because district courts are in a unique position to make such determinations, their conclusions are entitled to substantial deference. Here the district court's factual determination is not clearly erroneous, *see* 18 U.S.C. § 3742(e); *United States v. Hummer,* 916 F.2d 186, 191 (4th Cir.1990), and we therefore decline to set aside the court's decision not to impose the enhancement.

### V.

Finding no constitutional infirmities in Ellen's conviction and no errors in the district court's application of the Sentencing Guidelines, we affirm both the conviction and the sentence.

AFFIRMED.