**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael T. STRANDQUIST,
Defendant–Appellant.**

No. 92–5174.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1992.

Decided May 13, 1993.

---

David Patrick Towey, Towey & Associates, Washington, DC, argued for defendant-appellant.

Jane F. Barrett, Asst. U.S. Atty., Baltimore, MD, argued (Richard D. Bennett, U.S. Atty., Kathleen O. Gavin, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

## OPINION

MURNAGHAN, Circuit Judge:

The appellant, Michael T. Strandquist, was found guilty by a jury under two counts of illegally discharging pollutants on July 19, 1991, and July 26, 1991, into the navigable waters of the United States in violation of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* He appeals both his conviction and sentence.

### I.

Strandquist worked as a full-time manager for Halle Marina and Campground, located in Chesapeake Beach, Maryland. The Marina facilities include a campground, a boat basin with boat slips, and a bathing beach. The boat basin is located on Plum Point Creek, which flows into the Chesapeake Bay.

Strandquist's duties as manager included, among other things, overseeing the removal and disposal of the raw sewage generated by the Marina. Under his orders, employees were expected to pump the sewage from the recreational vehicles ("RVs") and campers using the Marina grounds into a tanker truck. The sewage was then to be pumped into one of three septic systems on the Marina property. Testimony revealed, however, that Strandquist and his employees frequently dumped the sewage from the sewage truck into a storm grate located on the northwest side of the property. Apparently, the storm grate was used for dumping when the septic systems were full and could no longer handle the Marina waste. Strandquist himself testified that either he or employees acting under his direction dumped sewage into the storm grate several times in 1991.

The storm grate is located next to the road bed that follows the edge of the boat basin. The evidence revealed that the grate was connected to an underground pipe that ran beneath the road and resurfaced in the boat basin. One employee testified that he saw toilet paper and other waste coming out of the pipe. Strandquist stated, however, that he was unaware that the sewage, when dumped into the grate, traveled to the basin through the pipe. He further testified that although he knew the storm grate was not an approved septic system, he believed the pipe leading from the grate was blocked.

After receiving allegations that raw sewage was being improperly discharged, agents of the FBI visited the Marina and spoke with Mark Malphrus, operator of a boat repair business at the Marina. On several dates, including July 19, 1991, Malphrus had observed what looked like sewage on the storm grate and noticed a strong, foul odor. On July 26, 1991, Malphrus met with the FBI agents, and all again noticed the same blackish-brown material, some fluid, and the strong odor at the grate. One agent also observed similar blackish-brown material flowing out of the outfall pipe into the basin, creating a brown, "cloudy plume."

On August 2, 1991, federal agents executed a search and seizure warrant at the Marina. The agents observed a Marina employee pumping raw sewage out of the sewage truck hose and into the storm grate. The cloudy plume was again observed emerging out of the outfall pipe in the basin. An EPA scientist testified that based on her experience, the material she observed at the grate was raw sewage; she also observed the cloudy plume in the basin. Officials also ran tests on samples taken from the sewage truck, the storm grate, and the water in the boat basin at the point of discharge from the pipe. The substances tested were found to be raw sewage. In addition, tests on the water from the basin indicated the discharge of raw sewage. The concentration of fecal coliform in the water was 2300 counts per 100 milliliters—a substantially higher concentration than that permissible for water recreation.

Officials also performed a dye test on the storm grate to verify its connection to the boat basin. Red dye was placed into the grate and then flushed with roughly 500 gallons of water. The red dye reappeared in the boat basin in the exact location where the cloudy plume earlier had appeared. The dye also flowed in an oblong form similar to the cloudy plume.

The jury found Strandquist guilty of two counts of violating the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(2), for the discharges into the storm grate on July 19, 1991, and July 26, 1991.[1] The district court sentenced Strandquist to five months imprisonment on each count to be served concurrently, supervised release for a period of one year, and home detention for five months during the supervised release.

On appeal Strandquist challenges both his conviction and sentence. Strandquist argues first that there was insufficient evidence to support his conviction of discharging raw sewage into navigable waters. Strandquist also asserts that the penalties under the Sentencing Guidelines, as applied in the instant case, contradict congressional intent. Finally, Strandquist challenges the district court's application of the Sentencing Guidelines, including the court's refusal to grant a reduction for acceptance of responsibility. We address each of the arguments in turn.

II.

■ Strandquist contends that the government failed to present sufficient evidence proving that any discharge for which he was charged reached the "navigable waters" of the boat basin as required for a conviction. *See* 33 U.S.C. §§ 1311(a), 1362(12). We review Strandquist's argument to determine whether any rational trier of fact could have concluded that the government had proven the essential elements of the crime charged beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The evidence, the jury having returned the findings of guilty, also should be viewed in a light most favor-able to the prosecution. *Id.* Based on the evidence presented by the government, we conclude that a rational jury could find beyond a reasonable doubt that the waste discharged on July 19, 1991, and July 26, 1991, flowed into the boat basin.

■ The government's case in chief provided considerable circumstantial evidence showing that the waste pumped into the storm grate flowed into the boat basin on the dates in question. It is clear "that circumstantial evidence may support a verdict of guilty, even though it does not exclude every reasonable hypothesis consistent with innocence." *United States v. George,* 568 F.2d 1064, 1069 (4th Cir.1978); *see also United States v. Jackson,* 863 F.2d 1168, 1173 (4th Cir.1989) (noting that "circumstantial evidence is treated no differently than direct evidence, and may be sufficient to support a guilty verdict"). Several witnesses testified as to seeing what appeared to be raw sewage on the storm grate on July 19, and July 26, 1991. FBI agent Cameron also witnessed a brown, cloudy plume emerging out of the pipe in the boat basin on July 26, 1991, and on August 2, 1991.

The tests conducted by the government on August 2, 1991, offer the most compelling evidence. First, tests run on the substances observed by witnesses confirmed the presence of raw sewage on the storm grate and confirmed that the water in which the brown plume floated contained raw sewage. Next, the red dye test revealed that the sewage flowed from the grate, through the underground pipe, and reemerged in the boat basin at the outfall pipe. Those tests provide the link to the journey of the sewage discharged into the storm grate on July 19, 1991, and July 26, 1991, for which Strandquist was convicted.

The evidence presented and the reasonable inferences arising from that evidence support the jury's conclusion that the sewage discharged by Strandquist on the dates charged in fact reached the navigable waters of the United States.

1. During the trial, the district court dismissed Count 3, for unlawful discharge of raw sewage on August 2, 1991, against Strandquist.

### III.

█ In challenging his sentence, Strandquist first argues that the Sentencing Guidelines for environmental offenses, in particular U.S.S.G. § 2Q1.3 for the mishandling of environmental pollutants,[2] as applied in the instant case, exceed the authority granted to the Sentencing Commission and ignore congressional intent as set forth in the penalty provisions of relevant environmental statutes. In particular, Strandquist, a first offender, argues that the Guidelines fail to differentiate among environmental crimes of varying seriousness, and that, as a result, prison terms will be imposed on virtually all environmental offenders, be they first or repeat offenders.[3]

We find Strandquist's argument lacking in merit. The Fourth Circuit already has addressed and rejected a similar argument—albeit under a set of circumstances that involved considerably more widespread environmental damage as well as substantial clean-up costs. In *United States v. Ellen,* 961 F.2d 462 (4th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 217, 121 L.Ed.2d 155 (1992), the Court rejected the argument of the defendant—a first offender whose actions damaged 86 acres of wetlands—that the Commission, in creating § 2Q1.3 of the Guidelines, contravened its enabling legislation:

> Section 2Q1.3 does not contravene the Guidelines' enabling legislation because the Sentencing Commission acted well within its discretion in classifying the instant offense as a serious one. Through the Clean Water Act and other environmental laws, Congress has determined that harm to the environment—*even absent imminent threats to public health, welfare, or safety* —is a public policy concern of the greatest magnitude. In the CWA in particular,

Congress determined that "the restoration of the natural chemical, physical, and biological integrity of the Nation's waters is *essential,*" ... and set a national goal of fully eliminating what [the defendant] did here: the discharge of pollutants into the waters of the United States.

*Id.* at 468 (emphasis added) (quoting S.Rep. No. 414, 92d Cong., 2d Sess. 7 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3674) (emphasis added). As noted by the *Ellen* court, Congress itself emphasized the importance and seriousness of its environmental goals by creating severe penalties—both fines *and* imprisonment—for willful violations of the Clean Water Act. *Id.* Although the destruction caused by the defendant in *Ellen* and that caused by Strandquist differ, we find that the same principles hold true. Even absent imminent threat to the public, the discharge of pollutants into the nation's waters remains a matter of great magnitude. The fact that the application of § 2Q1.3 may or will, as in the instant case, lead to a prison term as a sentence for a first conviction reflects a court's determination as to the seriousness of the offense and does not contravene the Guideline's enabling legislation.

### IV.

Strandquist next argues that even if the Guidelines for environmental offenses, as applied in the instant case, are valid, the district court nevertheless improperly calculated his sentence under U.S.S.G. § 2Q1.3(b)(1).[4] Strandquist's sentence was based on a total offense level of 11 and a Criminal History Category I. The district court began with a base offense level of six pursuant to U.S.S.G. § 2Q1.3(a). The district court then imposed a five-level upward adjustment for an "ongo-

---

**2.** Unless otherwise indicated, all references to the Guidelines applicable to Strandquist's sentencing are to the provisions effective November 1, 1991, the provisions under which Strandquist was sentenced.

**3.** In support of his argument, Strandquist points to the Congressional policy set forth in 28 U.S.C. § 994(j): "The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender

who has not been convicted of a crime of violence or an otherwise serious offense...."

**4.** Section 2Q1.3(b)(1) states in full:
Specific Offense Characteristics
(1)(A) If the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment, increase by 6 levels; or
(B) if the offense otherwise involved a discharge, release, or emission of a pollutant, increase by 4 levels.

ing, continuous, or repetitive discharge" under U.S.S.G. § 2Q1.3(b)(1)(A).[5]

Strandquist attacks the enhancement of his sentence pursuant to § 2Q1.3(b)(1)(A) on two separate grounds. First, Strandquist contends that the prosecution must prove actual "contamination" to trigger the application of § 2Q1.3(b)(1)(A), and the district court, he argues, enhanced his sentence without such proof. Second, Strandquist argues that the district court improperly increased the base offense level by finding that the offense was an "ongoing, continuous, or repetitive discharge." We address those arguments in turn.

### A.

■ According to Strandquist, the commentary to § 2Q1.3 indicates that the government must prove actual environmental contamination by at least a preponderance of the evidence in order for the court to increase the base offense level under either subsection (A) or (B) of § 2Q1.3(b)(1). Nothing in § 2Q1.3(b)(1) itself speaks of environmental contamination. The pertinent commentary, however, states:

> Subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination. A wide range of conduct, involving the handling of different quantities of materials with widely differing propensities, potentially is covered. Depending upon the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation a departure of up to two levels in either direction from that prescribed in these specific offense characteristics may be appropriate.

5. The enhancement included a guided downward departure of one level as authorized by Application Note 4. *See* U.S.S.G. § 2Q1.3, comment. (n. 4).

6. We note, however, that the Fifth Circuit has held that U.S.S.G. § 2Q1.2(b)(1) does *not* require additional proof of environmental contamination but rather takes contamination as a given. *United States v. Goldfaden*, 959 F.2d 1324, 1331 (5th Cir.1992) ("[W]e interpret the commentary to

U.S.S.G. § 2Q1.3, comment. (n. 4). As the commentary indicates, § 2Q1.3(b)(1) applies to a wide range of conduct and pollutants, and therefore a departure of up to two levels is permitted based upon the nature of the pollutant and the *degree* of harm caused by the defendant's actions. Using its discretion to exercise that option, the district court concluded that the nature of the contamination in the instant case merited a one-level departure.

The matter of proof of contamination has not yet been decided by the Fourth Circuit and need not be decided here [6] because the district court's finding of contamination is not clearly erroneous. Though the evidence at trial did not reveal vast or permanent contamination, sufficient circumstantial evidence was produced for the court to infer environmental contamination from the discharges of raw sewage into the storm grate. *Cf. United States v. Sellers*, 926 F.2d 410, 418 (5th Cir. 1991) (concluding that the district court could have inferred contamination under U.S.S.G. § 2Q1.2(b)(1) because the evidence showed that one of the 15 barrels dumped into the river was leaking); *United States v. Bogas*, 920 F.2d 363, 368 (6th Cir.1990) (finding it unnecessary to address a situation where no actual environmental contamination had been shown because it would have been "clearly erroneous" on the record to find no contamination from the discharge of toxic materials—even though "[t]here may have been no actual harm"). Testimony in the instant case, for example, indicated the basin showed dangerously high concentrations of fecal coliform on one of the days that raw sewage traveled into the basin from the grate. Accordingly, we reject Strandquist's argument as to the issue of "contamination."

### B.

■ Strandquist next asserts that the district court misapplied § 2Q1.3(b)(1)(A) when

explain that subsection (b)(1) takes environmental contamination as a given, but allows for upward and downward departures depending on the potency, size, or duration of the contamination."). Section 2Q1.2(b)(1), unlike § 2Q1.3(b)(1), applies to discharges of hazardous or toxic substances; however, the language of both sections and the pertinent commentary is the same.

it permitted an enhancement for an "ongoing, continuous, or repetitive discharge." Subsection (A) of § 2Q1.3(b)(1) states: "If the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment, increase by 6 levels." The question on appeal is whether the district court can consider multiple offenses, grouped under the Guidelines, for the purposes of applying an enhancement for an "ongoing, continuous, or repetitive" discharge. Strandquist contends that a single offense must itself result in an ongoing or repetitive discharge. The government established at trial, however, that the discharges with which Strandquist was charged occurred on more than one occasion, specifically on July 19, 1991, and on July 26, 1991. Thus, we find that the offense conduct as to the second count of conviction clearly demonstrates that a repetitive discharge occurred on July 26, 1991. *See also* U.S.S.G. § 3D1.3(a) (for counts grouped pursuant to § 3D1.2(a)–(c), the applicable offense level is the level for the most serious of the counts comprising the group). The district court properly enhanced the base level pursuant to § 2Q1.3(b)(1)(A) for an "ongoing, continuous, or repetitive discharge."

We further note that even if § 2Q1.3(b)(1)(A) did not apply, the district court made it patently clear it would have imposed exactly the same sentence if the base offense level were anywhere between nine and twelve. After rejecting the defendant's arguments, the district court stated it would, for example, apply on remand the four-level enhancement of U.S.S.G. § 2Q1.3(b)(1)(B): "if the offense otherwise involved a discharge, release, or emission of a pollutant, increase by 4 levels." The Fourth Circuit has stated "[t]he overlapping ranges doctrine obviates the necessity of selecting the appropriate range only when the district court expressly makes an independent determination that the sentence would be the same under either of the [potentially applicable] ranges in the absence of any dispute." *United States v. Willard,* 909 F.2d 780, 783 (4th Cir.1990); *United States v. White,* 875 F.2d 427, 432–33 (4th Cir.1989).

## V.

■ Finally, the defendant contends that the district court erred in not allowing a downward departure for acceptance of responsibility. *See* U.S.S.G. § 3E1.1. The determination of whether a defendant should receive a reduction for acceptance of responsibility is a factual finding to be reviewed under the clearly erroneous standard. *United States v. Gordon,* 895 F.2d 932, 937 (4th Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990). The Fourth Circuit has stated that the sentencing court is in a "unique position" to consider a departure, and "[i]n the final analysis, it is the district judge who must evaluate the acts and statements of a defendant." *White,* 875 F.2d at 431–32. In order to receive a downward departure, the "defendant must first accept responsibility for all of his criminal conduct." *Gordon,* 895 F.2d at 936.

■ The district court concluded that Strandquist did not exhibit complete acceptance for all of his criminal conduct, and we do not find his determination to be clearly erroneous. Strandquist argues that he fully admitted responsibility for the dumping of sewage into the storm grate. At the same time, however, Strandquist also challenged the findings that the sewage actually flowed into the boat basin from the grate and denied that he personally knew the sewage would flow into the boat basin. Under the circumstances, it was not clearly erroneous for the district court to refuse to grant a reduction for acceptance of responsibility.

Accordingly, as to both counts, the judgment is

AFFIRMED.