**PUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

MANUFACTURED HOUSING INSTITUTE;
AFFORDABLE RESIDENTIAL
COMMUNITIES, INCORPORATED;
TRULUCK INDUSTRIES, INCORPORATED,
                    *Petitioners,*

            v.                                  No. 04-1157

THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL
LEAVITT, Administrator,
                    *Respondents.*

On Petition for Review of an Order of
the Environmental Protection Agency.

Argued: October 26, 2005[1]

Decided: October 25, 2006

Before WIDENER, MOTZ, and DUNCAN, Circuit Judges.

---

Petition for review denied by published opinion. Judge Widener wrote
the opinion, in which Judge Motz and Judge Duncan concurred.

---

[1]The case was argued February 2, 2005, before a panel of Judge Nie-
meyer, Judge Michael, and Judge Duncan, which did not decide the case.
It was reargued October 26, 2005, before the present panel.

**COUNSEL**

**ARGUED:** Elizabeth Maria Richardson, BEVERIDGE & DIA-MOND, P.C., Washington, D.C., for Petitioners. David Jay Kaplan, UNITED STATES DEPARTMENT OF JUSTICE, Environment and Natural Resources Division, Washington, D.C., for Respondents. **ON BRIEF:** Gus Bauman, Justin A. Savage, April K. Roach, BEVER-IDGE & DIAMOND, P.C., Washington, D.C., for Petitioners. Thomas L. Sansonetti, Assistant Attorney General, John C. Cruden, Deputy Assistant Attorney General, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C.; Caroline Wehling, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Office of General Counsel, Washington, D.C., for Respondents.

---

**OPINION**

WIDENER, Circuit Judge:

This case is about federal regulation of water piped through various publicly and privately owned systems for public use. It specifically concerns a practice known as submetering, which, simply defined, is property owners metering and billing their tenants for water purchased by the owners but distributed to and actually used by the tenants. In 2003, to encourage conservation of water, respondent Environmental Protection Agency (EPA) reversed its long-held view with respect to apartment houses that submetering was selling water subject to regulation under the Safe Drinking Water Act of 1974 (the Act) and allowed that it was not. This reversal allowed the owner of a property such as an apartment building to submeter tenants without triggering federal drinking-water regulations. But EPA excluded manufactured housing, such as mobile-home parks, from the change. Petitioners, a trade association representing a variety of interests in the manufactured housing industry, including two owners of mobile-home properties, now challenge EPA's procedures and conclusions. For the reasons that follow, we deny the petition for review.

## I.

## A.

The Safe Drinking Water Act was passed to ensure that water systems met minimum national standards for protection of public health. See 42 U.S.C. § 300f (2003). In general, the Act governs all public water systems, which the Act defines as a system with fifteen or more service connections or one serving twenty-five or more people. 42 U.S.C. § 300f(4)(A). Whether ownership of the system be private or public, is not listed as a factor in the definition. The EPA tells us that in practice, several (or many) public water systems may connect with other systems to provide water service to consumers; in such a network, water is treated by one system, which sells the water to another system for further distribution or sale to end-users. This it calls a consecutive water system.

With certain variances and exemptions, the Act requires that EPA's regulations "apply to each public water system in each State." 42 U.S.C. § 300g; see generally 40 C.F.R., Part 141. But a public water system is exempt from compliance with those regulations if it:

(1)   . . . consists only of distribution and storage facilities (and does not have any collection and treatment facilities);

(2)   . . . obtains all of its water from, but is not owned or operated by, a public water system to which such regulations apply;

(3)   . . . does not *sell* water to any person; *and*

(4)   . . . is not a carrier which conveys passengers in interstate commerce.

42 U.S.C. § 300g (emphases added). Thus, an intrastate public water system is exempt from regulation if it obtains its water from a regulated system and if it neither treats nor sells the water. The legislative history of the exemption indicates that it was worded this way to "ex-

empt businesses which merely store and distribute water provided by others," and which does not sell or bill water as a separate item, such as hotels. HR. Rep. No. 93-1185 (1974), as reprinted in 1974 U.S.C.C.A.N. 6454, 6470.

The Act is enforced by the States as well as the federal government. States may apply for "primary enforcement responsibility" to enforce the Act. According to EPA, 49 States have done so. The EPA Administrator may grant such primary responsibilities if he determines that the State has adopted regulations "no less stringent" than the federal regulations and has appropriate enforcement mechanisms in place. 42 U.S.C. § 300g-2(a)(1) & (2). States thus are implicitly free to adopt more stringent regulations than those of EPA. *Id.* § 300g-2(a)(1). If EPA believes a state regulatory program does not meet its stringency requirements, the Act creates procedures to require that State to revise or withdraw its program on pain of losing primary enforcement authority, and for payment of civil penalties. 42 U.S.C. § 300g-3; see also 40 C.F.R. §§ 142.12(a), 142.17(a).

B.

Before 2003, EPA's longstanding position was that submetering was selling under the Act and those doing it therefore were subject to regulation. This position appears not to have been codified, but instead was set forth in policy memoranda. See JA 9-11; JA 20; (referring to two memos). In addition, EPA's position is evidenced by less-formal agency actions, including threats of litigation. For instance, EPA's hands-on approach included admonishing North Carolina to continue to adhere to EPA guidance as summarized in a letter from an EPA Regional Director, and, in response to a proposal by Georgia to liberalize unregulated submetering beyond what EPA would have allowed, EPA internal correspondence suggested that EPA might consider conditioning or withholding of grants or taking "targeted enforcement action" to ensure compliance. Notably, EPA actually threatened such grant withholding. On the other hand, EPA approved of an Alabama submetering plan on the ground that the State's commitment to water safety had ensured adequate monitoring. There is no indication in the record of like EPA actions taken directly against, or in favor of, individual property owners. For their part, property owners appear to have avoided selling or submetering and

hence regulation, by charging tenants for water via rent or a general fee or surcharge. It is generally accepted that submetering's triggering of federal regulations created a disincentive to submeter, which had the effect of discouraging water conservation. See, e.g., JA 3 (citing H. R. Rep. No. 104-632, at 55, 134 (1996), as reprinted in 1996 U.S.C.C.A.N. 1366, 1418, 1430-31); JA 116 (same).

The particularities of state programs and private practices aside, the parties agree that, prior to 2003, EPA had long construed the word "sell" as used in 42 U.S.C. § 300g(3) to mean billing and demanding payment for water provided. This interpretation accords with the Act's legislative history, which states that even a municipality assessing water taxes, or any entity that "sells water as a separate item or bills separately for water" would be subject to regulations under the Act. 1974 U.S.C.C.A.N. 6469-70. In August 2003, however, to promote water conservation by tying the end-user's cost to actual water use,[2] EPA proposed to allow unregulated submetering by owners of "residential properties such as apartment buildings." This change, EPA indicated, would not diminish the public health protections established by the Act.

As specified in the Administrative Procedure Act, see 5 U.S.C. § 553, EPA requested public comment on the proposed change and identified four specific topics for comment. So there may be no mistake about the adequacy of notice, we note that in its request for comments, EPA included the following:

> iii. Should EPA maintain the limitation of the draft revised policy to residential properties such as apartment buildings, or is it appropriate to extend the SDWA exemption for submetering to other property types? 68 Fed. Reg. 51779 (Aug. 28, 2003).

---

[2]Petitioners acknowledge that EPA's proposal would reduce water use by anywhere from 18% to 39%, though there is conflicting evidence that conservation might be "minimal." Petitioners do not challenge the genuineness of EPA's conservation concerns. Nor do they challenge the efficacy of the adopted changes. Rather, the gist of their argument relating to conservation is that EPA could have done even more to promote it by allowing them, too, to submeter.

In all, EPA received 78 comments, which compose the bulk of the record on appeal. As to the wisdom of the proposed change as a general matter, the vast majority of commenters were in favor of it for the reasons explained in the proposal—i.e., severing submetering from regulation would promote conservation and ease the regulatory burden on property owners. A few identified concrete health concerns that EPA had overlooked. See JA 152, 167-68 (citing legionnaire's disease); cf. JA 140. Several, including the State of Tennessee, questioned EPA's authority—vis-à-vis Congress--to reverse the historical interpretation.

Most commenters responding to this query perceived little difference among various types of properties, though they tended to state their position in general terms. Some commenters more specifically advocated exempting commercial buildings while others suggested that the nature of ownership should be the dispositive factor. Petitioners commented as well. As we have noted, see n.2, *supra*, they generally supported the proposed policy. But in response to EPA's specific query, petitioners urged that the revised policy should include manufactured housing on the basis of their contention that the water distribution systems of mobile-home parks are functionally the same as those of apartment buildings. (Petitioners' letter, like several comments on both sides, appears to have been a form letter. See, e.g., JA 195 (substantively identical letter). Notably, the United States Navy and the Department of Defense also argued in favor of extending the proposed policy beyond apartment buildings, to military facilities, which, like mobile-home parks, generally have underground pipes.

Several commenters opposed extending the exemption to mobile-home parks or other, similar properties. In general terms, this opposition rested on the nature of the parks' distribution systems, which, unlike apartment buildings', typically are underground. Simply put, it was suggested that this made the water supply more vulnerable to contaminants and attack than similar distribution systems above ground or in apartment-building interiors.

On December 23, 2003, EPA published its final policy. 68 Fed. Reg. 74,233. As originally proposed, the policy concluded that apartment buildings and similar properties could submeter without being deemed to "sell" water; in other words, to submeter without inviting

regulation. The policy rejected petitioners' position, however, and declined to extend the same exemption to properties, which have a large distribution system, or serves properties, such as "large mobile home parks," and "military installations." 68 Fed. Reg. 74233. Though refusing to codify a blanket exemption for such properties, the policy did not categorically bar one, either, and instead would allow item by item a State's determinations based on the characteristics of similar types of properties: "EPA agrees that submetering to achieve water conservation may be appropriate for other property types, which share similar characteristics to an apartment building . . . ." 68 Fed. Reg. 74234-35. Consistent with the Act's joint enforcement mechanisms and its prior practice, EPA left such case-by-case decisions to the States, but it listed factors that should be considered, such as whether there might be "backflow or cross[-] connection issues," whether the majority of the plumbing is underground, and whether the property is owned by an individual or an association. 68 Fed. Reg. 74235.

Petitioners now seek vacation of the policy and remand to the EPA.

II.

We exercise original jurisdiction over a petition for review of any "final action of the Administrator" under the Act. 42 U.S.C. § 300j-7(a)(2). EPA disputes that the emergency order at issue here constitutes a final action under the Act and raises other justiciability concerns, so we first address our authority to consider the petition. See *Chamblee v. Espy*, 100 F.3d 15, 17 (4th Cir. 1996).

EPA contends that the final policy guidance does not constitute "final action of the Administrator" for two reasons: the policy (1) is not the consummation of the decision making process, and (2) does not give rise to legal rights or consequences. See *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 274 (4th Cir. 1999) (citing *Bennett v. Spear*, 520 U.S. 154 (1997)). As to the former requirement, EPA argues that the policy does not preclude an extension to petitioners and leaves decisions to the States on a case-by-case basis. Thus, according to EPA, the final policy is just a suggestion. Petitioners respond that States are not free to ignore these suggestions, relying on the past EPA threats and involvement in state decision-making. They

also point out that this is EPA's last word, at least for the time being, and that EPA itself calls this the "Final Revised Policy." 68 Fed. Reg. 74233.

We are of opinion that the policy qualifies as a final action. EPA's threats levied against at least two States regarding their submetering oversight programs prove that States are not free to treat this EPA policy as a mere suggestion. And EPA's approval of Alabama's submetering policy indicates that approval was in fact required. Nor can EPA overcome the Act's language mandating that EPA's regulations apply to "each public water system in each State," or its command that state regulations must be "no less stringent" than the federal. Moreover, EPA does not argue that it will consider extending the policy to petitioners in the near future, much less that it has plans to do so. Therefore, the policy is not a step that the agency "might eventually take," *Appalachian Energy Group v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994), but the step that it did take.

As to whether the action gives rise to legal rights and consequences, we think this is self-evident. Regardless, for jurisdiction purposes we credit the affidavits by two corporate-owner petitioners that they do not submeter for fear of subjecting themselves to EPA regulations. See *Sierra Club v. EPA*, 292 F.3d 895, 900-01 (D.C. Cir. 2002). EPA's response, that petitioners are being regulated today as they were before the policy became final, is no defense to the fact that a realistic fear exists of being subject to the regulation.

EPA also contests on similar grounds both the ripeness of the petition and petitioners' standing to bring it. First, it asserts, the petition is not ripe because any adverse effects on petitioners depend on intervening rulings from state agencies. In this regard, EPA suggests a number of factors that could benefit from further development: state decisions relating to the size and type of manufactured housing, the water system, and soil conditions under which submetering might occur. Moreover, EPA contends that there is no "immediate, direct, and significant" hardship from withholding review. And EPA contends that petitioners lack standing for the related reason that their harm depends entirely on the "independent actions of third parties," referring to the States.

For the reasons set forth with respect to jurisdiction, we also conclude that the petition is ripe for review and that petitioners have standing. The elemental fact is, petitioners allege that they want to submeter but that the policy's failure to treat them like apartment-building owners prevents them from doing so, and they have sworn to this chilling effect. It is true that the record is silent regarding the extent of financial cost to petitioners. But EPA's patent regulatory exclusion from the protected class is more than the needed "decision as to whether review will be sought in the hands of those who have a direct stake in the outcome." See *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972). We are of opinion that petitioners have standing. Their individual injuries were not merely "value preferences" under *Sierra Club*, 405 U.S. at 740.

EPA's assurances that we would benefit from decisions by state agencies and courts—and EPA approvals or disapprovals thereof—has little appeal. We should not encourage federal-state conflict by insisting on state action in derogation of the federal policy. Accordingly, we turn to the petition's merits.

### III.

A court must uphold EPA action taken pursuant to the Act unless the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); see also *Montgomery County v. EPA*, 662 F.2d 1040, 1042 (4th Cir. 1981). Under this highly deferential standard, we "scrutinize the EPA's activity to determine whether the record reveals that a rational basis exists for its decision." *Natural Res. Def. Council v. EPA*, 16 F.3d 1395, 1401 (4th Cir. 1993).

In reviewing EPA's action, we bear in mind that the Act, like other environmental statutes, requires balancing conflicting priorities—in this case, water conservation, private compliance costs, state regulatory interests, and the safety of public water systems. Accordingly, we do not "sit as a scientific body, meticulously reviewing all data under a laboratory microscope." *Natural Res. Def. Council*, 16 F.3d at 1401. Nor is it "for the judicial branch to undertake comparative evaluations of conflicting scientific evidence." *Natural Res. Def. Council v. EPA*, 824 F.2d 1211, 1216 (D.C. Cir. 1987). Rather, EPA must "explain its

course of inquiry, its analysis, and its reasoning," and show a rational connection between its decision-making process and its ultimate decision. *Natural Res. Def. Council*, 16 F.3d at 1401; see also *Natural Res. Def. Council*, 824 F.2d at 1216 ("Our review aims only to discern whether the agency's evaluation was rational."). With this framework in mind, we turn to petitioners' challenges to EPA's policy: (1) that the notice and comment procedures were inadequate, and (2) that decision to distinguish between apartment buildings and mobile-home parks was arbitrary and capricious.

A.

Petitioners offer several reasons why EPA's notice and comment procedures were flawed. First, the final policy allegedly "departed from the propos[ed]" policy, by drawing a distinction between "large mobile home parks" not exempted from regulation, although having been submetered, and "apartment buildings" that were so exempted. 68 Fed. Reg. 74235. Petitioners contend that they did not know such a distinction would be made and that a 1996 Congressional report prompted EPA to revisit the issue and led them to believe just the opposite, that any possible change would treat apartment buildings and mobile-home parks the same. They take issue with the creation of what they call the intermediate category of regulation—the properties that may be excluded after state evaluation of relevant factors.

To begin with, we agree that the APA's notice and comment procedures were applicable in this case. In making this determination, the question is whether the policy is a legislative rule, which in turn requires us to determine whether the policy has the force of law. *United States v. Ellen*, 961 F.2d 462, 465 (4th Cir. 1992). Here, again, EPA claims that the policy has no legally binding consequences. EPA also points out that it did not codify the policy in the Code of Federal Regulations or internally characterize the policy as a legislative rule. We disagree, largely for the reasons stated above with respect to our discussion of "final agency action," ripeness, and standing. Moreover, since EPA's prior, binding, decades-long interpretation existed chiefly in memorandum form, the agency's issuance of the new policy in the Federal Register—though not a codification—indicates a more formal agency action than anything that preceded it, and thus an equally binding one. It certainly was nothing like an internal manual

for agencies' staff, as in *Ellen*. See 961 F.2d at 466. EPA's position is further undermined by the fact that the current policy is quite opposite to the previous policy ("Any previous EPA statements or policy memoranda are superceded by this memorandum.")), despite the fact that the statutory language did not change. Last but not least, EPA's attempts to comply with APA notice-and-comment procedures suggest that the agency believed them to be applicable, at least until this litigation. For these reasons, those procedures were applicable.

But we are of opinion that the procedures were in fact followed. We agree with EPA that the final policy was a logical outgrowth of the proposed one, at least in part because the proposal asked for comments on the very distinction petitioners now challenge. In fact, the wording of the invitation to comment—"[s]hould EPA maintain the limitation" to apartment buildings, "or is it appropriate to extend" it to other types of properties?—may even suggest a default preference for not extending the exemption. As a result, petitioners could not fail to comprehend the possibility of such a distinction's being made. And they actually perceived that they might be excluded and argued vehemently against it. Likewise, numerous other commenters on both sides were able to discern what was at stake. Petitioners' claim not to have been alerted to the distinction eventually made thus is quite without merit.

Finally, given the statutory framework and the States' significant role in it, we cannot concur with petitioners' criticism of EPA for creating three categories of properties—in other words, for giving the States latitude to experiment with allowing unregulated submetering on a case-by-case basis. First, the new policy allows some chance—albeit restricted—for unregulated submetering, and consequently petitioners' position has improved somewhat. Furthermore, the criteria listed by the agency for States' consideration are consistent with EPA's mandate to ensure the safety of the water supply and plainly derive from comments received. Even petitioners recognized that water safety may depend on "varying types of soil conditions, including industrial areas and brownfields," though they disclaimed the applicability of such concerns to mobile-home parks. But it is obvious that apartment building piping is rarely, if ever, located in such soil and that mobile-home-park piping may well be. This is sufficient to support EPA's creation of an intermediate category.

In sum, the final rule's intermediate category was a "logical out-growth of the notice and comment[s]," balancing safety with promoting water conservation, *Chocolate Mfrs. Ass'n of the United States v. Block*, 755 F.2d 1098, 1105 (4th Cir. 1985), and not, as in that case, a situation where the final rule "reaches a conclusion exactly opposite to that proposed," 755 F.2d at 1103. We should not penalize EPA simply because the precise contours of its incremental approach did not develop until after the agency had reviewed the comments it sought, including those from a number of States:

> The requirement of submission of a proposed rule for com-ment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule it proposed, partly at least in response to submissions.

*Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 (D.C. Cir. 1973).

Petitioners' final objections to EPA's action are that the regulation which "categorically exempts only apartment buildings from regula-tion under the Act but not other residential properties such as manu-factured home communities is an impermissible arbitrary interpretation of the phrase 'sell water'," as used in the statute 42 U.S.C. § 300(g); and they add that EPA's application of the statute to submetered properties "lacks a rational basis and draws an arbitrary and capricious distinction between apartments and other types of resi-dential submetered properties such as manufactured home communi-ties." Br. p.2. The very narrowness of the argument emphasizes that it does not recognize the duty of EPA as either the principal or a co-principal administrator of the allocation and use of the water resources of the United States.

The statute we are most immediately concerned with is the Safe Drinking Water Act. The purpose of the legislation is to assure that water supply systems serving the public meet minimum national stan-dards for protection of public health. The statute is administered by the EPA and establishes a joint federal-state system for assuring com-pliance with national standards. The duties of the EPA as the adminis-trator of the statute include not only the elimination of harmful

contaminants but also the siting requirements for new facilities so that the EPA may "provide adequate assurance that public water systems will be able to provide a continuous supply of healthful drinking water." H. R. Rep. No. 93-1185 (1974), as reprinted in 1974 U.S.C.C.A.N. 6454, 6467. That quality and quantity of water should not be distinguishable has been decided by the Court under the Clean Water Act. *PUD No. 1 of Jefferson County v. Washington Dep't of Ecology*, 511 U.S. 700, 719 (1994), in which the Court stated

> Petitioners also assert more generally that the Clean Water Act is only concerned with water 'quality,' and does not allow the regulation of water 'quantity.' This is an artificial distinction. In many cases, water quantity is closely related to water quality; a sufficient lowering of the water quantity in a body of water could destroy all of its designated uses, be it for drinking water, recreation, navigation or, as here, as a fishery.

The EPA is also the administrator of the Clean Water Act, Pub. L. 95-217. The legislative history clearly designates that one of the EPA obligations under that statute is water conservation and seeing to a reduction of the total flow of sewage or unnecessary water consumption. 1 U.S.C.C.A.N. (95 Stat.) 1573.

And we should not omit that the legislative history of the Water Resources Research Act of 1984, which is devoted to stimulating research and training scientists in the field of water resources, has the finding that "The development and allocation of our scarce water resources is an issue that will continue to plague policy makers well in the 21st Century." 2 U.S.C.C.A.N. (98 Stat.) 302.

In the case before us, the EPA, in order to comply with its obligation to see to the furnishing of safe drinking water, quantity as well as quality, has, because it has deemed the distribution system to be safe from pollution in apartment houses, authorized a regulatory exemption for apartment houses but has not authorized the same categorical exemption for manufactured homes communities because, as a category, it could not say that the distribution system in the manufactured homes communities was free from pollution. That same regulatory change complained of here, however, would authorize

exemption for manufactured homes communities on a case-by-case basis.

We are of opinion that this is a classic case of a decision which has been given by Congress to the EPA with respect to allocation of water resources, and that EPA is taking reasonable action to perform *both* of its duties to supply clean drinking water, free from pollution and in sufficient quantity. We hold that the regulation in question is supported by a rational basis and is neither arbitrary nor capricious. The same holding applies to petitioners' claim that the EPA interpretation of the phrase "sell water" is arbitrary.

For the foregoing reasons, the petition for review is accordingly

*DENIED*.