STATE OF GEORGIA, and Harold F. Reheis, Director, Environmental Protection Division, Georgia Department of Natural Resources, Plaintiffs,

Robert D. Vickery, Kathy Vickery, Robert Hunt, Janice Hunt, William J. Wilson, Laura A. Wilson, Donald Scott, Marion E. Scott, and Norma Weaver, Intervenor Plaintiffs,

v.

CITY OF EAST RIDGE, TENNESSEE, Defendant.

Civil Action File No. 4:94–CV–0281–HLM.

United States District Court,
N.D. Georgia,
Rome Division.

Nov. 20, 1996.

Office of State Attorney General, Atlanta, GA, for State of Georgia, Harold F. Reheis.

O. Michael Carter, Terry L. McGhehey, Lusk Carter & McGhehey, Chattanooga, TN, Elaine Galler Levine, Beskin Levine & Powell, Atlanta, GA, for Robert D. Vickery, Kathy R.C. Vickery, Robert C. Hunt, Janice A. Hunt, Billy Joe Wilson, Laura A. Wilson, Donald Scott, Marion E. Scott, Norma M. Honeycutt Weaver, Plaintiffs.

Craig R. Allen, William Milligan Foster, Clayton M. Whittaker, John M. Hull, Foster Foster Allen Durrence, Chattanooga, TN, for City of East Ridge.

## ORDER

HAROLD L. MURPHY, District Judge.

This is a Clean Water Act case in which Plaintiffs and Intervenor Plaintiffs allege that a sewer owned and maintained by Defendant discharged raw sewage in violation of 33 U.S.C.A. § 1251 *et seq.* (1986). Intervenor Plaintiffs also assert state law claims of nuisance, trespass, negligence, negligence per se, and breach of contract against Defendant. The case is before the Court on Plain-. tiffs' Motion for Summary Judgment [30], Intervenor Plaintiffs' Motion for Summary Judgment [35], Plaintiffs' Motion for Leave to File Newly Discovered Evidence [41],[1] and Defendant's Motion for Partial Summary Judgment [46].

### I. Background

Defendant City of East Ridge is a municipal corporation located in Tennessee immediately north of the Georgia border. Defendant owns and operates a sewerage system that services residents of both Tennessee and Catoosa County, Georgia. The sewer line that services the Georgia residents begins in Tennessee, dips briefly into Georgia, and returns to Tennessee, where it joins other lines and eventually discharges into a treatment facility located in Chattanooga, Tennessee. (Hallum Dep. Ex. 10.) The portion of the sewer line located in Georgia collects sewage from approximately 200 homes in the City of

Diane L. DeShazo, State of Georgia Law Department, Atlanta, GA, Alan Gantzhorn,

---

[1]. Defendant has not filed a response to Plaintiffs' Motion for Leave to File Newly Discovered Evidence. The Court therefore concludes that Defendant does not oppose Plaintiffs' Motion. Local Rule N.D.Ga. 220–1(b).

Rossville. (Hallum ¶ 9; Hallum Dep. Ex. 10.)

Defendant has constructed manholes at regular intervals along its sewer lines, including manhole # 462, which is situated in the portion of the sewer line that travels through Georgia. More specifically, manhole # 462 is located in the middle of Ponderosa Street, directly in front of the homes of Intervenor Plaintiffs Robert Vickery and Norma Weaver. (Vickery Dep. Ex. 49.) Vickery and Weaver allege that, since February 1990, heavy rains have caused Defendant's sewer line to overflow on 19 separate occasions. (Weaver Aff. ¶¶ V–VI; Vickery Aff. ¶¶ 10–11.) During each of these overflows, Vickery and Weaver have observed wastewater containing raw sewage, feces, toilet paper, tampons, and other materials flow out of manhole # 462. (Id.) The wastewater flows into a storm drain across the street, which empties into an unnamed tributary located behind Vickery's and Weaver's homes. (Vickery Aff. ¶ 9; Vickery Dep. Ex. 49.) The wastewater also flows onto Vickery's and Weaver's properties, down the property lines, and into the unnamed tributary. (Vickery Aff. ¶ 9; Weaver Aff. ¶ V.) The unnamed tributary flows northeast and intersects with Spring Creek, which then proceeds northeast until it crosses the State border and enters Tennessee. (Defendant's Response to Plaintiffs' Motion for Summary Judgment Ex. A.)

During 12 of the alleged overflows, Vickery and Weaver telephoned the State of Georgia's Environmental Protection Division ("EPD") to report the overflow of raw sewage. (Affidavit of Michael Stevens ("Stevens Aff.") ¶¶ 5–21; Affidavit of Michael Phipps ("Phipps Aff.") ¶¶ 5–6.) On March 4, 1992, Michael Stevens, an environmental specialist employed by EPD, visited Vickery's property in response to a reported overflow. (Stevens Aff. ¶ 11.) Stevens observed residual sewage in the street and in Vickery's yard, and Stevens surmised that the sewage had reached the storm drain and flowed into the unnamed tributary. (Id.)

On February 11, 1994, Stevens responded to another reported overflow from the sewer.

(Id. ¶ 14.) Upon arriving at Ponderosa Street, Stevens observed that manhole # 462 was "overflowing profusely," with "wastewater containing raw sewage and toilet paper flowing into two nearby storm drains ... and into a drainage ditch," both of which emptied into the unnamed tributary. (Id. ¶ 15.) Stevens also smelled an odor coming from the wastewater, and saw evidence of raw sewage and toilet paper in the tributary. (Id.) Stevens took color photographs of the surroundings, while Vickery took videotapes during the examination. (Id. Ex. 5; Vickery Aff. Ex. 1.) Vickery also videotaped overflows of wastewater from manhole # 462 on four other occasions in 1994. (Vickery Aff. Ex. 1 & 2.)

Plaintiffs filed their complaint on November 10, 1994. On December 12, 1994, Defendant mailed out letters notifying Intervenor Plaintiffs, as well as its other sewer services customers living in Georgia, that Defendant would terminate the sewer services for all Georgia customers in March 1996.[2] (Intervenor Plaintiffs' Complaint Ex. C.) On November 11, 1995, Intervenor Plaintiffs filed their complaint, adding five state law claims.

After Plaintiffs initiated this lawsuit, Vickery observed six additional overflows of wastewater from manhole # 462. (Vickery Aff. ¶ 11.) On March 6, 1996, Michael Phipps, an environmental specialist employed by EPD, responded to a reported overflow from manhole # 462. Phipps observed wastewater overflowing from the manhole and traced the wastewater as it was diverted by a crude dam of sandbags into a nearby storm drain, which then emptied through a pipe into the unnamed tributary. (Id. ¶¶ 6–7.)

During his visit on March 6, 1996, Phipps took color photographs of the wastewater, and collected water samples from the unnamed tributary at three locations. (Id. ¶ 10 & Ex. 6.) Phipps extracted the first sample approximately 100 yards downstream from where the storm drain pipe emptied into the unnamed tributary. (Id. ¶ 10.) Phipps took the second sample approximately 100 yards upstream from where the storm drain pipe emptied into the unnamed tributary, and the

---

2. To date, Defendant has not terminated the sewer services for the Georgia customers.

third approximately 1.5 stream miles upstream from the locations from which the other samples were extracted. (*Id.*) After undergoing analysis at EPD's laboratory, the samples revealed the presence of fecal coliform bacteria in the following concentrations:

| | |
|---|---|
| First Sample | 54,000 M.P.N./100 ml. |
| Second Sample | 24,000 M.P.N./100 ml.[3] |
| Third Sample | 475 M.P.N./100 ml. |

(*Id.* Ex. 7.)

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." In short, everything in the record must demonstrate the absence of a genuine issue of material fact. *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir.1984). The moving party's burden is discharged by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In assessing whether the movant has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). Once the moving party has adequately supported its motion, the nonmovant has the burden of showing summary judgment is improper by coming forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir.1991). Rather, the court only determines whether there are genuine issues of *material* fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Disputed facts which do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

In addition to materiality, courts also must consider the genuineness of the alleged dispute. *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Id.* at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). Thus, the standard mirrors that for a directed verdict: "[T]he inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

## III. Plaintiffs' and Intervenor Plaintiffs' Motions for Summary Judgment

### A. *Defendant's Liability for Violations of the Clean Water Act*

A person violates the Clean Water Act ("Act") by discharging a pollutant into the

---

**3.** The high concentration of fecal coliform bacteria in Sample Two apparently is related to the discharge of sewage from a nearby manhole that is unrelated to the subject matter of this litigation. (Phipps Aff. ¶¶ 8–10.)

waters of the United States without proper authorization. 33 U.S.C.A. § 1311(a) (1986). Generally, any discharge is unlawful unless performed pursuant to and in accordance with a permit issued under the National Pollutant Discharge Elimination System (NPDES). §§ 1311, 1342. Persons who discharge pollutants without a NPDES permit, or in violation of the terms of the permit, are subject to civil penalties of up to $25,000 per day for each violation, on a strict liability basis. § 1319(d); *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir.1990). Plaintiff State of Georgia is authorized by the U.S. Environmental Protection Administration ("EPA") to issue NPDES permits. (Hallum Aff. ¶ 19.) Defendant does not possess a NPDES permit to discharge pollutants in Georgia. (Defendant's Answer to Plaintiff's Complaint ¶ 13.)

In the absence of federal or state enforcement proceedings and after proper notice,[4] a citizen may commence a civil action against a person who is alleged to have discharged a pollutant without an NPDES permit. § 1365(a) & (f).

■ A "citizen" under the Act is a person or persons having an interest which is or may be adversely affected by the alleged violations. § 1365(g). The Supreme Court has recognized that a state falls within the definition of a citizen under the Act, and therefore Plaintiff State of Georgia is entitled to prosecute a citizen suit pursuant to § 1365. *United States Dept. of Energy v. Ohio*, 503 U.S. 607, 616–18, 112 S.Ct. 1627, 1634, 118 L.Ed.2d 255 (1992). Plaintiff Harold F. Reheis and all Intervenor Plaintiffs are citizens of the State of Georgia whose interests are adversely affected by Defendant's alleged violations. In sum, all Plaintiffs and Intervenor Plaintiffs are "citizens" entitled to bring suit pursuant to § 1365.

A "person" under the Act is defined to include municipalities, which in turn includes municipal corporations. § 1362(4) & (5). As a municipal corporation, Defendant is a "person" subject to suit under the Act.

■ To establish Defendant's liability for violating the Act, Plaintiffs and Intervenor Plaintiffs must show that Defendant: (1) "discharged," or added; (2) a pollutant; (3) to navigable waters; (4) from a point source; (5) without a permit. *Committee to Save Mokelumne River v. East Bay Mun. Utility Dist.*, 13 F.3d 305, 308 (9th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994); *National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165 (D.C.Cir.1982).

### 1. Element One: Discharge

The Act defines "discharge" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C.A. § 1362(12). This definition of "discharge" encompasses the other relevant elements of the test set forth in *Mokelumne River*. This section therefore will consider only whether manhole # 462 actually discharged sewage. The remaining elements of a "discharge" as defined by § 1362(12) are considered below in the Court's application of the *Mokelumne River* test.

In support of their claims that raw sewage and other materials discharged from manhole # 462 on 19 occasions, Plaintiffs and Intervenor Plaintiffs have adduced five types of evidence. First, Georgia residents testified that they witnessed raw sewage overflowing from manhole # 462 on 19 occasions, including the following dates:

| | |
|---|---|
| 2/5/90 | 3/27–28/94 |
| 2/16/90 | 4/21/94 |
| 1/8/92 | 5/28/94 |
| 2/25/92 | 12/5/94 |
| 12/19/92 | 2/15/95 |
| 1/26/93 | 3/8/95 |
| 1/11–12/94 | 1/6/96 |
| 2/10–11/94 | 1/26/96 |
| 2/22–23/94 | 3/6/96 |
| 3/2/94 | |

(Weaver Aff. ¶¶ IV–VI; Vickery Aff. ¶¶ 8–11.) Second, employees of the Georgia EPD testified that, on 13 occasions, Georgia residents reported overflows of raw sewage from manhole # 462, including the following dates:

---

**4.** No federal action to enforce the Act with respect to sewage overflows from manhole # 462 has been filed, and Plaintiffs served Defendant with the proper notice of intent to sue as required by 33 U.S.C.A. § 1365(b). (Plaintiffs' Complaint Ex. 1 & 2.)

2/5/90    2/10–11/94
2/16/90    2/22–23/94
1/8/92    3/2/94
2/25/92    3/27–28/94
12/19/92    4/21/94
1/26/93    3/6/96
1/11–12/94

(Stevens Aff. ¶¶ 5–20; Phipps Aff. ¶¶ 5–6.) Third, EPD employees testified that, on two occasions, they traveled to Ponderosa Street and observed raw sewage overflowing out of manhole # 462. The dates of these visits are February 11, 1994, and March 6, 1996. (Stevens Aff. ¶¶ 14–15; Phipps Aff. ¶¶ 5–6.) Fourth, Plaintiffs have introduced videotapes that document sewage overflowing out of manhole # 462 on the following dates:

2/10–11/94    3/27–28/94
2/22–23/94    4/21/94
3/2/94

(Vickery Aff. Exs. 1 & 2.) Fifth, Plaintiffs have introduced photographs taken by EPD employees on February 11, 1994, and March 6, 1996, that document sewage overflowing from manhole # 462. (Stevens Aff. Ex. 5; Phipps Aff. Ex. 6.)

■ Defendant has not introduced an affidavit or any other evidence to rebut the testimony, photographs, and videotape introduced by Plaintiffs and Intervenor Plaintiffs. Therefore, no genuine dispute exists as to whether discharges occurred on the 19 dates described above.

### 2. Element Two: Pollutant

The Act defines "pollutant" to include, among other things, sewage, garbage, and sewage sludge. 33 U.S.C.A. § 1362(6). The Court therefore must determine whether the evidence adduced by Plaintiffs and Intervenor Plaintiffs supports a conclusion that the discharges in fact contained sewage.

■ Four eyewitnesses—Robert Vickery, Norma Weaver, Michael Phipps, and Michael Stevens—testified that overflows from manhole # 462 contained feces, toilet paper, tampons, and other materials. (Weaver Aff. ¶¶ V–VI; Vickery Aff. ¶¶ 10–11; Stevens Aff. ¶¶ 14–15; Phipps Aff. ¶¶ 6–7.) Defendant argues that Vickery and Weaver's testimony is inadmissible, because Vickery and Weaver are lay witnesses and do not possess suffi-

cient expertise to identify these materials. However, courts on several occasions have relied on lay witnesses' observations of sewage to establish a violation under § 1365. *See, e.g., Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114, 118 (2d Cir.1994) (lay witnesses saw manure flowing in a ditch), *cert. denied*, —— U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995); *United States v. Strandquist*, 993 F.2d 395, 397–98 (4th Cir.1993) (lay witnesses saw sewage on a storm grate and noticed a strong, foul odor). Eyewitnesses in this case, including Vickery, Weaver, Stevens, and Phipps, all saw raw sewage overflowing from manhole # 462. Defendant has not introduced evidence that rebuts this testimony. The Court therefore may rely on the eyewitnesses' testimony to conclude that the discharges from manhole # 462 contained raw sewage.

■ In addition, the eyewitnesses' testimony is, in several instances, supported by other evidence. Six of the discharges, for example, are documented in videotapes and photographs. Defendant suggests this evidence shows only clear water overflowing from manhole # 462, and thus does not support a conclusion that the overflows contained raw sewage. However, the sewer connected to manhole # 462 was an active sewer at the times of the alleged overflows. Under the summary judgment standard set forth in *Matsushita*, the Court believes no rational trier of fact could conclude that overflows from an active sewer contain no sewage. 475 U.S. at 587, 106 S.Ct. at 1356. As a result, the photos and videotape support the Court's conclusion that no genuine dispute exists concerning the presence of sewage in the overflows.

### 3. Element Three: To Navigable Waters

The Act defines "navigable waters" as "the waters of the United States, including territorial seas." 33 U.S.C.A. § 1362(7). Although Congress included the term "navigable" in the statute, Congress intended to broadly define the waters that would fall within the legislation's protection. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132–33, 106 S.Ct. 455, 462, 88

L.Ed.2d 419 (1985). Thus, the EPA, in promulgating regulations under the Act, defines "navigable waters" to include all interstate waters as well as tributaries of these waters. 40 C.F.R. § 122.2 (1996) In addition, courts applying the Act have effectively ignored the term "navigable." *See, e.g., Riverside,* 474 U.S. at 132–33, 106 S.Ct. at 462 ("the term 'navigable' as used in the Act is of limited import"); *United States v. Ashland Oil and Transp. Co.,* 504 F.2d 1317, 1321–29 (6th Cir.1974) (non-navigable tributary that joins other tributaries to form navigable river is protected by Act); *Beartooth Alliance v. Crown Butte Mines,* 904 F.Supp. 1168, 1173 (D.Mont.1995) (navigable waters "has been interpreted to include virtually any surface waters, navigable or not").

■ Given this law, the Court concludes that the unnamed tributary, located behind the properties of Intervenor Plaintiffs Weaver and Vickery, is a "navigable water" as defined by the Act. The unnamed tributary intersects with Spring Creek near Georgia Highway 218. (Defendant's Response to Plaintiff's Motion for Summary Judgment Ex. A.) Spring Creek flows north into Tennessee. (*Id.*) The unnamed tributary thus flows into interstate waters, i.e., Spring Creek, and falls within the definition of "navigable waters" under the Act.[5]

■ Plaintiffs and Intervenor Plaintiffs next must establish that the sewage contained in the overflows from manhole # 462 reached the unnamed tributary. Eyewitnesses Robert Vickery, Norma Weaver, Michael Stevens, and Michael Phipps all testified that they observed the sewage flow into a storm drain and out of a pipe into the unnamed tributary. (Vickery Aff. ¶¶ 8–9; Weaver Aff. ¶¶ V–VI; Stevens Aff. ¶ 15; Phipps Aff. ¶¶ 6–7.) Vickery also testified that sewage flowed across his property and into the unnamed tributary. (Vickery Aff. ¶ 9.) Such perception testimony is admissi-

ble to establish a violation of the Act. *Southview Farm,* 34 F.3d at 118; *Strandquist,* 993 F.2d at 397–98.

In addition, Michael Phipps took samples from the unnamed tributary in the water immediately downstream from the storm drain pipe that revealed, after laboratory analysis, a concentration of fecal coliform bacteria approaching 54,000 M.P.N./100 ml. This concentration is well above 475 M.P.N./100 ml., the level found 1.5 stream miles upstream of the storm drain pipe. Together, these samples confirm the presence of raw sewage in the unnamed tributary, well above acceptable levels.[6] (Phipps Aff. ¶¶ 10–12 & Ex. 7.) For these reasons, the test results support the conclusion that sewage flowed into the unnamed tributary.

Defendant has not introduced an affidavit, laboratory test result, or any other evidence to rebut the testimony and laboratory test results introduced by Plaintiffs and Intervenor Plaintiffs. Therefore, no genuine dispute exists with respect to whether sewage flowed into the unnamed tributary.

**4. Element Four: From a Point Source**

■ The Act defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ... channel, tunnel, conduit, well, [or] discrete fissure...." 33 U.S.C.A. § 1362(14). The courts and the EPA have interpreted this definition broadly. 55 Fed. Reg. 47990, 47997 (Nov. 16, 1990) (preamble to Storm Water Regulations under NPDES); *Southview Farm,* 34 F.3d at 118; *Beartooth Alliance,* 904 F.Supp. at 1173. Given this law, the Court concludes that manhole # 462 and the underlying sewer pipe is a point source under the Act.

■ Plaintiffs and Intervenor Plaintiffs next must show that the sewage present in the unnamed tributary originated from man-

---

5. Defendant expends much energy contesting Plaintiffs and Intervenor Plaintiffs' statements that the unnamed tributary flows first into Black Branch Creek and then into Spring Creek. Although Defendant's argument is correct, it is an argument without meaning because Defendant's exhibit establishes that the unnamed tributary flows directly into Spring Creek. (Defendant's

Response to Plaintiffs' Motion for Summary Judgment Ex. A.)

6. Michael Phipps testified that WQC Rule 391–3–6–.03(6)(a)(i) sets 4,000 M.P.N./100 ml. as the maximum allowable concentration of fecal coliform bacteria in a body of water similar to the unnamed tributary.

hole # 462. The evidence supporting this element is identical to that described in section III.A.4, *supra* in which the Court assessed whether the sewage reached a navigable water. The only difference is that the eyewitness testimony suggests that the sewage flowing into the unnamed tributary originated from manhole # 462. In addition, the Court believes the results of laboratory tests performed by Michael Phipps serve as circumstantial evidence to support the eyewitness testimony.

This conclusion is not altered by Defendant's arguments that Phipps' laboratory tests are irrelevant. Defendant contends that the laboratory tests fail to establish that any sewage present in the unnamed tributary originated from manhole # 462 for three reasons: (1) Phipps did not test for the presence of sewage in the water overflowing from manhole # 462, or in the pipe leading from the storm drain to the unnamed tributary; (2) Phipps did not test for the possibility that sewage contained in groundwater may have seeped into the unnamed tributary; and (3) Phipps did not compare his samples to samples taken on days when the sewer did not overflow.

Defendant's arguments are unpersuasive. The high concentration of fecal coliform bacteria revealed by Phipps' tests confirms the presence of raw sewage in the unnamed tributary. In contrast, a control sample, taken 1.5 stream miles upstream, revealed a normal concentration of fecal coliform bacteria, compared to a significantly higher concentration near the storm drain pipe. Although circumstantial, this evidence strongly supports the testimony of eyewitnesses who observed sewage flowing from manhole # 462 into the storm drain. Defendant's suggestion that groundwater may have served as the origin of the fecal coliform bacteria is not supported by any test results, affidavits, or other evidence. Without such evidence, Defendant fails to establish a genuine dispute regarding the source of the sewage present in the unnamed tributary, as mere speculation is

not sufficient to rebut a properly supported motion for summary judgment. Given the unrefuted evidence introduced by Plaintiffs and Intervenor Plaintiffs, a reasonable jury could only conclude that the sewage present in the unnamed tributary originated from manhole # 462.

### 5. Element Five: Without a NPDES Permit

Defendant admits it does not possess a NPDES permit authorizing the discharge of pollutants in Georgia. (Defendant's Answer to Plaintiff's Complaint ¶ 13.)

■ Accordingly, Plaintiffs and Intervenor Plaintiffs have satisfied all five elements necessary to establish that Defendant violated the Clean Water Act on the 19 occasions described above.[7]

### B. *The Mootness Requirements of Gwaltney*

■ In addition to proving that the defendant violated the Clean Water Act, a plaintiff proceeding under § 1365 must prove that the defendant was violating the Act at the time the suit was initiated. *Gwaltney v. Chesapeake Bay Foundation*, 484 U.S. 49, 64–65, 108 S.Ct. 376, 385, 98 L.Ed.2d 306 (1987). In other words, the plaintiff must show that, when the suit was filed, there existed "a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 57, 108 S.Ct. at 381. If on or after the date the suit is filed, the defendant continued to violate the Act, the plaintiff may request both injunctive relief and civil penalties under the Act. *Atlantic States Legal Foundation, Inc. v. Tyson Foods*, 897 F.2d 1128, 1134–35 (1990).

Plaintiffs filed their Complaint on November 10, 1994, and Intervenor Plaintiffs filed their Complaint on November 11, 1995. The evidence shows that, since that time, overflows from Defendant's sewer violated the Clean Water Act on six occasions.[8] Accord-

---

7. Because liability under the Clean Water Act is automatic once the trier of fact determines that a pollutant entered the water, Defendant's arguments concerning minimal adverse impact to the

affected waters is irrelevant. §§ 1311, 1319, 1342.

8. These dates include: December 5, 1994; February 15, 1995; March 8, 1995; January 6, 1996;

ingly, the evidence satisfies the mootness requirements set forth in *Gwaltney* and *Tyson Foods.*

### C. Penalties

The parties have agreed to defer consideration of the proper penalties for each violation until the Court disposed of the parties' motions for summary judgment. The parties therefore must file briefs on this issue, with appropriate citation to authority.

### IV. Defendant's Motion for Partial Summary Judgment [9]

#### A. The Availability of Civil Penalties for Defendants' Violations of the Clean Water Act Prior to the Filing of the Complaint

Defendant argues that the Clean Water Act authorizes civil penalties only for violations that occur after the date on which the complaint is filed. Defendant's theory, however, is contrary to both the provisions of the Act authorizing civil penalties and the case law interpreting these provisions.

The Act states that "[a]ny person who violates the ... [Act] shall be subject to a civil penalty not to exceed $25,000 per day for each violation." 33 U.S.C.A. § 1319(d). The statute says nothing about limiting the assessment of penalties to violations occurring after the filing of a civil complaint.

■ Defendant therefore relies on the Supreme Court's opinion in *Gwaltney of Smithfield, Ltd., v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), in which the Court held that a civil plaintiff bringing suit under the Clean Water Act must allege that violations are ongoing at the time the suit is commenced. 484 U.S. at 58–60, 108 S.Ct. at 382. Defendant's reliance on *Gwaltney* is misplaced. *Gwaltney* creates a jurisdictional test that is applied when a defendant seeks to dismiss as moot a civil action filed under

the Act. Beyond setting forth this jurisdictional test, *Gwaltney* is silent on the issue of damages to be assessed for violations established at trial. *Id.* at 64–67, 108 S.Ct. at 385–86.

The Eleventh Circuit has, subsequent to *Gwaltney,* mandated a district court to assess penalties pursuant to § 1319(d) for violations occurring in May 1986, even though the plaintiff did not file suit until April 1987. *Atlantic States Legal Found. v. Tyson Foods,* 897 F.2d 1128, 1130, 1143 (1990). The court found this holding to be consistent with *Gwaltney:*

> When the Supreme Court concluded in its *Gwaltney* decision that § 1365 permits citizens' actions against polluters while there are ongoing violations, the Court effectively approved the assessment of penalties based on past violations (the only possible basis for assessing a penalty).

*Id.* at 1143 (quoting *Chesapeake Bay Foundation v. Gwaltney of Smithfield,* 890 F.2d 690, 696 (4th Cir.1989)). Thus, "[u]nder the Clean Water Act, civil penalties attach as of the date a permit violation occurs. Liability is fixed by the happening of an event ... that occurred in the past." *Id.* A contrary holding, the court reasoned, would contravene the policies of the Clean Water Act in two ways. First, "if post-suit compliance results in a mooting of the suit for civil penalties, then citizens will have less incentive to bring suit since they know the case may be deemed moot and dismissed before judgment." *Id.* at 1136–37. Second, barring civil penalties for past violations would diminish the Act's deterrent effect, because a defendant may avoid paying penalties simply by complying with the Act after the complaint is filed. *Id.* at 1137.

■ For these reasons, the Court cannot accept Defendant's theory that the Act bars civil penalties for violations occurring before the complaint is filed. To the contrary, a court must assess civil penalties under

---

January 26, 1996; March 6, 1996. *See* Part III.A, *supra.*

**9.** On July 30, 1996, Defendant filed a Motion for Partial Summary Judgment, to which Plaintiffs and Intervenor Plaintiffs responded on August 8, 1996. Local Rule 220–1(c) allows a party to file

a reply motion within 10 days of the filing of a response motion. Because 10 days have passed and Defendant has not filed a reply motion, Defendant's Motion for Partial Summary Judgment is ripe for disposition by the Court.

§ 1319(d) for any violation proven by the plaintiff. *Tyson Foods,* 897 F.2d at 1142 (statutory language in Act "makes clear that once a violation has been established, some form of penalty is required").[10]

## B. Whether Damages Under the Clean Water Act Are Determined by the Court or a Jury

The parties agree that the determination of penalties assessed for a violation of the Clean Water Act is an equitable matter to be decided by the Court, not a jury. 33 U.S.C.A. § 1319(d); *Tull v. United States,* 481 U.S. 412, 425–27, 107 S.Ct. 1831, 1840, 95 L.Ed.2d 365 (1987). The parties also agree that any monetary penalties will be paid into the Treasury of the United States, not to Plaintiffs or Intervenor Plaintiffs. *See Tyson Foods,* 897 F.2d at 1136.

## C. The Availability of Punitive Damages for Intervenor Plaintiffs' State Law Claims

▆▆▆▆▆▆ Intervenor Plaintiffs seek an award of punitive damages for their state law claims, as allowed by O.C.G.A. § 51–12–5.1.[11] The law of Georgia is well settled, however, that punitive damages are not available against governmental entities. *See, e.g., Provident Mutual Life Ins. Co. v. City of Atlanta,* 864 F.Supp. 1274, 1280 (N.D.Ga. 1994); *Metropolitan Atlanta Rapid Transit Auth. v. Boswell,* 261 Ga. 427, 405 S.E.2d 869 (1991); *City of Lafayette v. Morgan,* 220 Ga.App. 543, 469 S.E.2d 532, 534 (1996). Defendant is a Tennessee municipal corporation and thus is a governmental entity. *City of Lafayette,* 469 S.E.2d at 534. The Court therefore concludes that Defendant cannot be held liable for punitive damages.

Intervenor Plaintiffs seek to avoid the holding of *Boswell* and its progeny by arguing that Defendant, as well as the taxpayers living in the city limits, have benefited financially from Defendant's violations of the Clean Water Act. In addition, Intervenor Plaintiffs argue that punitive damages are particularly appropriate in light of the allegedly willful and malicious conduct perpetrated by Defendant. These arguments fail to escape the broad public policy that inhibits an award of punitive damages against government entities:

> [A]n award of punitive damages against a [governmental entity] 'punishes' only the taxpayers, who took no part in the commission of the tort. . . . Indeed, punitive damages imposed on a [governmental entity] are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers.

*Boswell,* 405 S.E.2d at 870 (quoting *City of Newport v. Fact Concerts,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)) (brackets in original). The *Boswell* Court further points out that "if a government official acts knowingly and maliciously to [injure others], he may become the appropriate object of the community's vindictive sentiments. A [governmental entity], however, can have no malice independent of the malice of its officials." *Id.*

Intervenor Plaintiffs have not shown that the taxpayers of the City of East Ridge have played a role in the violations of the Clean Water Act underlying this case. And, as pointed out in *Boswell,* allegations of malicious conduct are more appropriately directed at city officials, not Defendant. For these reasons, the Court concludes that the public policy concerns set forth in *Boswell* apply

---

**10.** Because the Court concludes that Defendant is liable for violations occurring prior to the filing of the complaint, the Court need not consider Defendant's arguments that civil penalties cannot be assessed prior to the filing of an amended complaint.

Moreover, Defendant's arguments with respect to the filing of amended complaints in no way impacts the Court's holding that this case is not moot under *Gwaltney. See* section III.B; *supra.*

The mootness doctrine established in *Gwaltney* provides that alleged violations must be ongoing at the time the plaintiff "files suit," not at the time a plaintiff files an amended complaint. *Tyson Foods,* 897 F.2d at 1134.

**11.** The Clean Water Act does not provide for an award of punitive damages in a civil action. 33 U.S.C.A. § 1319(d).

with equal force to this case. Defendant therefore is entitled to summary judgment with respect to Intervenor Plaintiffs' claim for punitive damages.

### D. Georgia's Statute of Limitations and Intervenor Plaintiffs' Claims for Damage to Real or Personal Property

Both parties agree that Georgia's statute of limitations bars civil actions involving damage to real or personal property that occurred more than four years before the filing of a complaint. O.C.G.A. §§ 9–3–30 & 9–3–31. The parties disagree on the exact date on which Intervenor Plaintiffs filed the Complaint, as Defendant argues that Intervenor Plaintiffs failed to properly serve Defendant with a copy of the Complaint as required by the Federal Rules of Civil Procedure.

■ Federal Rule of Civil Procedure 24(c) provides that a party filing a motion to intervene must comply with the service requirements contained in Federal Rule of Civil Procedure 5. Rule 5(a) states that a copy of every pleading filed "subsequent to the original complaint" must be served upon all other parties. This requirement may be satisfied by serving the pleading upon the party's attorney, unless otherwise directed by the Court. Rule 5(b). Intervenor Plaintiffs' filed the Complaint after Plaintiffs filed the "original complaint" to this case. The Intervenor Plaintiffs' Complaint is therefore a pleading filed "subsequent to the original complaint" under Rule 5(a), and Intervenor Plaintiffs properly served Defendant under Rule 5(b) by mailing a copy of the Complaint to Defendant's counsel on April 3, 1995. (Intervenor Plaintiffs' Motion for Leave to Intervene, Certificate of Service.) [12]

Intervenor Plaintiffs filed the Complaint with the Court on October 11, 1995. Thus, under Georgia's statute of limitations, Intervenor Plaintiffs' claims for damages to real or personal property accruing prior to October 11, 1991, are barred as a matter of law. Defendant is entitled to summary judgment with respect to these claims.

### E. Intervenor Plaintiffs' Breach of Contract Claim

Defendant argues that summary judgment is appropriate with respect to Intervenor Plaintiffs' breach of contract claim for two reasons: (1) Defendant is entitled as a matter of law to terminate its customers' sewer services, for any reason, if the customer resides outside the city limits; and (2) no contract existed between the parties.

Intervenor Plaintiffs counter that this case is governed by *Memphis Light, Gas & Water v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). In *Memphis Light*, the Court held that, because Tennessee law creates a property right in the utility service, a customer's services could not be terminated without due process of law. 436 U.S. at 10–12, 98 S.Ct. at 1561. Relying on *Memphis Light*, Intervenor Plaintiffs argue that they were not afforded due process before Defendant sent notice that their sewer service was to be terminated, thus giving rise to a claim for damages.

■ However, *Memphis Light* cannot be applied as broadly as Intervenor Plaintiffs suggest. *Memphis Light* carefully limits its holding to circumstances in which state law creates a protectable property interest in the utility service under consideration. 436 U.S. at 10–12, 98 S.Ct. at 1561. No Georgia statute or case suggests that Georgia recognizes a property interest with respect to sewer services. As a result, the Court concludes that Intervenor Plaintiffs are not entitled to due process before Defendant acts to terminate their sewer services.

■ Of course, the lack of a due process right to sewer services does not result in Defendant's ability to terminate Intervenor Plaintiffs' services at will. In Georgia, an

---

12. Even if Intervenor Plaintiffs' Complaint is not a pleading filed "subsequent to the original complaint," the Court could simply invoke Rule 4(m) and direct Intervenor Plaintiffs to serve a copy of the Complaint upon Defendant within a specified time. *See Henderson v. United States*, —— U.S. ——, —— n. 5, ——, 116 S.Ct. 1638, 1641 n. 5, 1643, 134 L.Ed.2d 880 (1996) (Rule 4(m) permits a district court to enlarge the time for service "even if there is no good cause shown"); *Panaras v. Liquid Carbonic Indus.*, 94 F.3d 338, 340 (7th Cir.1996) (same).

agreement between a water company and its customer is governed by the provisions of the Georgia Commercial Code. *Zepp v. Mayor & Council of Athens,* 180 Ga.App. 72, 75, 348 S.E.2d 673 (1986). Under the Code, the provision of water services "constitutes a continuing offer by the city to sell the particular utility service which the plaintiff accepts by utilizing the utility service." 1987 Ga.Op. Atty.Gen. No. U87–27, 1987 WL 119603 (Oct. 29, 1987) (citing *Zepp,* 180 Ga.App. at 75, 348 S.E.2d 673). The provision of sewer services is sufficiently analogous to water services that the reasoning of *Zepp* may be extended to this case. Intervenor Plaintiffs' acceptance of Defendant's continuing offer therefore created an enforceable implied contract between the parties. *Id.*

■■■ Moreover, Defendant's notice to Intervenor Plaintiffs that the sewer service would be terminated may constitute an anticipatory repudiation of this contract under O.C.G.A. § 11–2–610. Under Georgia law, it is a question of fact whether a party's conduct is sufficient to repudiate a contract and amount to anticipatory breach. *Jones v. Solomon,* 207 Ga.App. 592, 428 S.E.2d 637, 639 (1993). As a result, questions of fact exist whether Defendant's termination notice constituted an anticipatory repudiation of the parties' contract, and if so, whether Defendant subsequently retracted the repudiation as permitted by O.C.G.A. § 11–2–611.

Finally, the Court notes that, in addition to damages resulting from Defendant's termination notice, Intervenor Plaintiffs seek contract damages for Defendant's alleged failure to maintain the sewer line and for "exacerbating" the discharges of sewage onto Intervenor Plaintiffs' property. Defendant has adduced no facts to contradict these allegations. If true, the allegations may comprise a breach of the parties' contract. The Court therefore concludes that sufficient questions of material fact exist to render inappropriate Defendant's request for summary judgment with respect to the breach of contract claim.

### F. Whether Georgia Law Bars Intervenor Plaintiffs From Simultaneously Claiming Damages Under Abatable Nuisance and Permanent Nuisance

■■■ Defendant argues that Georgia law bars Intervenor Plaintiffs from claiming damages under both abatable and permanent nuisance theories. Georgia courts, however, have concluded that a plaintiff may litigate both abatable and permanent nuisance claims; the plaintiff simply may not receive a damages award for both claims. *City of Warner Robins v. Holt,* 220 Ga.App. 794, 470 S.E.2d 238, 241 (1996). The determination of whether the plaintiff's evidence establishes an abatable nuisance or permanent nuisance is conferred to the trier of fact, which then may award the proper form of damages. *Id.* If the trier of fact awards damages under both theories, the award must be adjusted to reflect an award for only one theory. *Id.*

If the nuisance is abatable, the measure of damages is the lost rental value for so long as the nuisance continues. *Id.* If the nuisance is permanent, the measure of damages is the diminution of the fair market value of the property. *Id.* Moreover, Intervenor Plaintiffs correctly point out that, in a continuing abatable nuisance case, a successful plaintiff "is not limited to recovering only rental value; rather, [the plaintiff] may recover any special damages whether the injury is of a temporary or permanent nature." *City of Columbus v. Myszka,* 246 Ga. 571, 272 S.E.2d 302, 305 (1980); *City of Atlanta v. Murphy,* 194 Ga.App. 652, 391 S.E.2d 474, 476 (1990).

### G. Whether Georgia Law Bars Simultaneous Claims of Trespass and Nuisance [13]

■■■ Georgia law allows a plaintiff to seek damages for both trespass and nuisance. *See Brand v. Montega Corp.,* 233 Ga. 32, 209 S.E.2d 581, 582 (1974). In *Brand,* the plaintiff sought damages for claims of trespass and nuisance, and the trial court allowed both claims to go to the jury. *Id.* The Supreme Court affirmed, with the qualifica-

---

13. Intervenor Plaintiffs have voluntarily withdrawn the negligence and negligence per se claims. (Intervenor Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment at 27.)

tion that a claim for "continuing trespass" is the equivalent of a claim for continuing nuisance. *Id.* Intervenor Plaintiffs' Complaint alleges both "past and continuing trespass." (Complaint ¶ 61.) Under *Brand,* Intervenor Plaintiffs' claim of continuing trespass is subsumed within the nuisance claim. However, Intervenor Plaintiffs may properly seek damages for the trespass claim and the nuisance claim. *See Ellis v. Gallof,* 220 Ga.App. 518, 469 S.E.2d 288, 289 (1996) (affirming jury verdict in favor of plaintiff for both nuisance and trespass claims in water damage case).

## V. Conclusion

ACCORDINGLY, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment [30], **GRANTS** Intervenor Plaintiffs' Motion for Summary Judgment [35], and **ORDERS** Plaintiffs and Intervenor Plaintiffs to file briefs, within 20 days, recommending the penalties that must be assessed pursuant to the Clean Water Act. Defendant then will have 20 days to respond, and Plaintiffs and Intervenor Plaintiffs may file a reply brief if necessary within 10 days of the filing of Defendant's Response.[14] The Court also **GRANTS** Plaintiffs' Motion for Leave to File Newly Discovered Evidence [41]. Finally, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Partial Summary Judgment [46] as discussed above. The remaining claims of Intervenor Plaintiffs and Defendant's counterclaim against Intervenor Plaintiffs will be set for trial in January.

14. The Court observes that this briefing schedule provides sufficient time for the parties to conduct appropriate settlement negotiations.