**UNITED STATES of America,**
**Plaintiff,**

v.

**Derrik HAGERMAN and Wabash**
**Environmental Technologies,**
**LLC, Defendants.**

**Cause Nos. IP 06–139–CR–1 H/F,**
**IP 06–139–CR–2 H/F.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 28, 2007.

SENTENCING ENTRY

DAVID F. HAMILTON, District Judge.

A grand jury indicted defendants Derrik Hagerman and Wabash Environmental Technologies, LLC for violating 33 U.S.C. § 1319(c)(4) by knowingly making false

statements in documents required to be filed and maintained under the Clean Water Act. Defendants went to trial on the ten counts in the amended indictment in May 2007. The jury found both defendants guilty on all ten charges. On November 15, 2007, the court imposed sentence, including a total prison sentence of sixty months for Mr. Hagerman, which was within the Sentencing Guideline range as calculated by the court.[1] Although the court explained its reasons in detail in the hearing, it might be useful to other courts, attorneys, and parties for the court to make some of its reasoning more easily available, particularly with respect to some arguments raised by the defense and by *amicus curia* Washington Legal Foundation, Inc., which argued for a sentence of probation on the grounds that the applicable Sentencing Guidelines are unreasonably harsh and contrary to the Sentencing Reform Act of 1984.

## I. *The Offense Conduct*

Mr. Hagerman was the president and principal owner of Wabash Environmental Technologies, LLC, also known as "WET." WET operated an industrial wastewater treatment facility along the Wabash River near Terre Haute, Indiana. In 2001, WET had secured a National Pollutant Discharge Elimination System Permit that authorized the company to discharge wastewater into the Wabash River subject to limits on the concentrations of listed pollutants in the effluent. The WET permit imposed limits on, among other pollutants, ammonia, biological oxygen demand ("BOD5"), copper, zinc, and phenol, which all figured in the charges and evidence in this case.

The Clean Water Act requires a permit for the discharge of pollutants into navigable waters. 33 U.S.C. §§ 1311(a), 1342. The Act requires a permit holder like WET to monitor and test its own effluent to determine whether it is complying with the permit conditions and to report the results truthfully and promptly to state and/or federal environmental protection agencies. See 33 U.S.C. § 1318; 40 C.F.R. § 122.41(h)—(*l*) (generally applicable permit conditions, including reporting requirements). The required reports include both Monthly Monitoring Reports (MMRs) and Discharge Monitoring Reports (DMRs). The Clean Water Act provides for administrative, civil, and criminal sanctions for violating its requirements. Negligent violations of the Act or of permit conditions may be prosecuted criminally as misdemeanors. 33 U.S.C. § 1319(c)(1). Deliberate (knowing) substantive violations can be punished more severely as felonies. 33 U.S.C. §§ 1319(c)(2), (c)(3). The Clean Water Act also makes knowing submission of false reports a felony:

> Any person who knowingly makes any false material statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this chapter or who knowingly falsifies, tampers with, or renders inaccurate any monitoring device or method required to be maintained under this chapter, shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than 2 years, or by both. If a conviction of a person is for a violation committed after a first conviction of such person under this para-

---

**1.** The statutory maximum sentence for one violation of 33 U.S.C. § 1319(c)(4) is two years. The court combined concurrent and consecutive sentences on the ten counts to produce a total of five years in prison. Mr. Hagerman's sentence also included one year of supervised release and the required special assessments. The company's sentence was five years probation and special assessments. The court also ordered that both defendants are jointly responsible for restitution in the sum of $237,680.74.

graph, punishment shall be by a fine of not more than $20,000 per day of violation, or by imprisonment of not more than 4 years, or by both.

33 U.S.C. § 1319(c)(4). A responsible corporate officer can be personally responsible for criminal violations. 33 U.S.C. § 1319(c)(6). There is no doubt here that Mr. Hagerman qualified as a responsible corporate officer for WET.

The ten charges in the amended indictment covered MMRs and DMRs submitted on five separate dates from February 26, 2004 through November 24, 2004. The charges cover reports of effluent levels of ammonia, BOD5, copper, zinc, and phenol, and refer to thirty-two separate reports of effluent levels for specific pollutants.

The government's evidence showed that WET employed laboratory technicians who conducted the testing and reported the results to Hagerman on forms called "bench sheets." Their reports showed effluent levels well above the permitted levels on the occasions included in the indictment. The government's evidence also showed that Mr. Hagerman destroyed the bench sheets he received from the technicians and instead filled out the required MMRs and DMRs with numbers that showed effluent levels that complied with the permit levels. Hagerman did not have any records of test results to support the numbers that he reported to the government. In essence, he "dry-labbed" the false results he reported. At trial, the government offered records and copies of records of testing that the laboratory technicians had saved from Mr. Hagerman's efforts to destroy evidence. In his trial testimony, Mr. Hagerman claimed that the copies of the bench sheets and other documents from the technicians were fakes and that the technicians had actually reported to him the lower pollutant levels he had included in the required reports. He claimed that they had reported these numbers to him on "post-it notes and scraps of paper," and that he had not kept them. The jury found both defendants guilty of knowingly making false statements as charged in all ten counts.

## II. *Sentencing Guideline Calculations*

 Although the Sentencing Guidelines are no longer mandatory, the court must first determine how they apply to the case before ultimately imposing a sentence that complies with the standards of 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 245–46, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). The court must consider the applicable guidelines, but a district court imposing a sentence may not presume that a guideline sentence is reasonable. *Rita v. United States*, 551 U.S. ——, 127 S.Ct. 2456, 2465, 168 L.Ed.2d 203 (2007) (holding that an appellate court, but not a district court, may apply presumption of reasonableness).

The parties agreed that the applicable guideline is USSG § 2Q1.2. The case involves several portions of the guideline, which states in full:

§ 2Q1.2. Mishandling Of Hazardous Or Toxic Substances Or Pesticides; Recordkeeping, Tampering, And Falsification; Unlawfully Transporting Hazardous Materials In Commerce

(a) Base Offense Level: 8

(b) Specific Offense Characteristics

(1) (A) If the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a hazardous or toxic substance or pesticide into the environment, increase by 6 levels; or

(B) if the offense otherwise involved a discharge, release, or emission of a hazardous or toxic substance or pesticide, increase by 4 levels.

(2) If the offense resulted in a substantial likelihood of death or serious bodily injury, increase by 9 levels.

(3) If the offense resulted in disruption of public utilities or evacuation of a community, or if cleanup required a substantial expenditure, increase by 4 levels.

(4) If the offense involved transportation, treatment, storage, or disposal without a permit or in violation of a permit, increase by 4 levels.

(5) If a recordkeeping offense reflected an effort to conceal a substantive environmental offense, use the offense level for the substantive offense.

(6) If the offense involved a simple recordkeeping or reporting violation only, decrease by 2 levels.

(7) If the defendant was convicted under 49 U.S.C. § 5124 or § 46312, increase by 2 levels.

The correct total offense level for Mr. Hagerman is 24. The court started with a base offense level of 8, grouping all ten counts together. Applying § 2Q1.2(b)(5), the court found that his record-keeping offenses reflected an effort to conceal substantive environmental offenses, so the court used the other specific offense characteristics applicable to substantive environmental offenses. First, the court added six levels under § 2Q1.2(b)(1)(A) because the offenses involved ongoing, continuous, and/or repetitive discharges of toxic pollutants into the environment. The court then added four levels under § 2Q1.2(b)(3) because the clean-up resulting from the discharges required substantial expenditure. The court then added four levels under § 2Q1.2(b)(4) because the offenses involved treatment and disposal of pollutants in violation of a permit. Finally, the court added two levels under § 3C1.1 based on Mr. Hagerman's multiple efforts to obstruct justice, including destruction of evidence, perjury at trial, and efforts to intimidate and to manipulate the testimony of a government witness. Mr. Hagerman had no prior criminal record and was in criminal history category I. The court calculated his guideline range as 51 to 63 months in prison.

 Mr. Hagerman argued that the correct offense level is only 8. He based this argument on subsection (b)(5), quoted above, which he contends should be interpreted to use only the base offense level and none of the specific offense characteristics for the substantive environmental offenses. He also relies on the Background note for § 2Q1.2, which states in part: "The first four specific offense characteristics provide enhancements when the offense involved a substantive violation."

The defendant's argument conflicts with § 1B1.5 of the Sentencing Guidelines, which provides instructions for such references to guidelines for other offenses. Section 2Q1.2(b)(5) instructs the court to use the offense level for substantive offenses. Section 1B1.5(b)(1) instructs in such cases: "An instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline (i.e., the base offense level, specific offense characteristics, cross references, and special instructions), except as provided in subdivision (2) below." Subdivision (2) does not apply here, so the specific offense characteristics for substantive environmental offenses covered by § 2Q1.2 also apply to Mr. Hagerman's record-keeping offenses.

Accepting Mr. Hagerman's argument on this point would seriously undermine criminal enforcement of the Clean Water Act. He seeks to create a dramatic difference in punishment for substantive offenses and for fraudulent record-keeping designed to conceal such substantive offenses and/or to make them much more difficult to prosecute and prove. Under his theory, per-

sons intent on profiting from illegal pollution would have a powerful incentive to falsify reports. If they were successful, under his theory, they could reasonably hope to limit any prosecution to offenses with an offense level of 8, which would only rarely lead to prison sentences, rather than the prison sentences advised by the guidelines for serious substantive offenses.

■ Mr. Hagerman also argued that any adjustment under § 2Q1.2(b)(1) should be limited to 4 levels rather than 6. The evidence at trial showed that Mr. Hagerman's record-keeping crimes enabled WET to discharge wastewater into the Wabash River with pollutant levels far above those permitted. Those discharges covered a period of at least ten months during which WET discharged many millions of gallons of polluted wastewater. The discharges can fairly be described as ongoing, continuous, and repetitive. The full 6–level enhancement was justified here.

■ The upward adjustment for obstruction of justice under § 3C1.1 was justified for three separate and independent reasons. First, in approximately October 2004, WET laboratory technician Lahn Neill gave some bench sheets with genuine test data to the certified operator of the WET plant, Dave Arnold. Tr. 156–57. Mr. Arnold seemed surprised and left to talk with Mr. Hagerman. Later that evening, Mr. Hagerman went to Ms. Neill's home and demanded that she give him her original documents showing true (and illegally high) pollutant levels. He also instructed her to erase any computer records that would show her true test results. Ms. Neill gave Mr. Hagerman a box of

documents that have not been seen again. Later that same week, Mr. Hagerman joked to Ms. Neill that it was amazing that the company dumpster had been scorched in a fire. Tr. 161. It is reasonable to hold Mr. Hagerman responsible for the loss or destruction of the records that Neill turned over to him. See Tr. 159–62.[2]

Second, in May 2006 when the criminal investigation was nearing its completion, Mr. Hagerman sought out Ms. Neill again and tried to persuade her to sign or confirm an utterly false account of the entire situation. See Gov. Ex. 404 (from sentencing hearing).

Third, when Mr. Hagerman testified at trial, he committed perjury. He testified that the laboratory technicians reported real test results to him on scraps of paper and post-it notes rather than on the bench sheets and that he threw away these scraps of paper with the critical data that he said supported the numbers he reported. Tr. 396–99. This was his explanation of the fact that he had utterly no documentary support for the test results that he reported in the MMRs and DMRs. Recall that WET was in the business of treating industrial wastewater. The supposed scraps of paper, if they had existed, would have been the critical documents for the company to show that it was complying with the permit that was essential to its entire business. (Not surprisingly, the Clean Water Act requires permittees to retain such records for at least three years. See 33 U.S.C. § 1318; 40 C.F.R. § 122.41(j).) Mr. Hagerman's story about the scraps of paper was simply preposterous. He also testified that the results on the bench sheets (the copies of the ones he

---

**2.** Neill kept a set of copies to protect herself. The government used those documents to prove its case. The court recognizes that Mr. Hagerman seems to have destroyed the documents before he knew of the government's investigation, but the upward adjustment under § 3C1.1 is still appropriate. It is obvious that his conduct was purposefully calculated, and likely, to thwart the investigation and prosecution of his crimes. See USSG § 3C1.1, App. Note 1.

had destroyed) were fakes that he had never seen before. *E.g.*, Tr. 424–29. This testimony was false, material, and deliberate. There were a number of other important details on which he lied at trial, but these central ones are more than sufficient to make the point.

Mr. Hagerman argued that the court should not impose the obstruction enhancement based on the court's own determination unless the court was very certain it was dealing with deliberate perjury. The court has no doubts on this score. There was no room for honest failures of memory or misunderstandings regarding the absurd story that Mr. Hagerman told under oath at trial.

The result of these guideline calculations was a total offense level of 24 and criminal history category I, for a guideline range of 51 to 63 months in prison.

### III. *Non–Guideline Issues*

■ The defense argued for a nonguideline sentence with probation or much less prison time, contending that a much lighter sentence would be sufficient to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). Mr. Hagerman emphasized his lack of a criminal record, his role as a husband and father, and his leadership in civic activities in Terre Haute. The court considered these factors, which are not unusual when the criminal has committed nonviolent offenses in his role as a business owner or executive. In view of the seriousness of the crimes and the need for deterrence, the court does not believe these factors warrant a lower sentence than the one imposed.

The defense pointed out that there is no proof of specific environmental harm resulting from WET's wastewater discharg-

es. If there had been such proof, the case might well have warranted a heavier sentence. The argument does not persuade the court to be more lenient because the defendant's own conduct made it very difficult for the government to measure and prove any such harm. By falsifying the MMRs and DMRs, Mr. Hagerman concealed from regulatory authorities for many months the quantities of pollutants in the millions of gallons of wastewater that he was discharging into the Wabash River. By the time environmental authorities learned of his violations, those pollutants had washed down-river and could not be traced back to WET. When the authorities finally learned of his violations, they shut down the business promptly to prevent further harm, but the absence of proof of more specific harm is not a significant mitigating factor here.

*Amicus curia* Washington Legal Foundation also argued for a sentence of probation for Mr. Hagerman. The Foundation did not address all factors relevant to Mr. Hagerman's case but argued that the Sentencing Guidelines are unreasonable as applied to these crimes under the Clean Water Act.[3] The centerpiece of this argument is the premise that the Sentencing Guidelines were intended to reflect average sentencing practices prior to their development, while reducing the frequency of unusually light or unusually heavy sentences for similar defendants convicted of similar crimes. The Foundation argues that the Sentencing Commission

> ignored Congress' mandate to review past sentencing practices to determine "average sentences imposed in [each] category of cases," and for cases involving sentences of imprisonment, the

---

**3.** The Foundation has long been interested in the Sentencing Guidelines for environmental crimes. See *Washington Legal Foundation v. United States Sentencing Comm'n,* 89 F.3d

897 (D.C.Cir.1996) (suit seeking access to deliberations and documents of advisory group on environmental guidelines).

length of such terms *actually served* " to serve as the "starting point" *before* the Commissioners were allowed to exercise their presumably expert and informed judgment about whether to depart from such past practice, and how far to depart.

Amicus Br. at 6, quoting 28 U.S.C. § 994(m). The Foundation asserts that the data on earlier sentencing practices lacked information about sentences for similar environmental crimes.

From the materials cited by the Foundation, it appears that the Sentencing Commission gathered and considered substantial evidence about a broader category of "white-collar" and regulatory crimes, which would include the environmental crimes that the Foundation argued should have required more specific analysis. In addition, the Foundation's argument fails to acknowledge the deliberate decision by Congress and the Sentencing Commission to raise sentences for white-collar economic crimes, including environmental crimes like Mr. Hagerman's. The statutory subsection quoted above begins with the sentence: "The Commission shall insure that the guidelines reflect the fact that, in many cases, current sentences do not accurately reflect the seriousness of the offense." 28 U.S.C. § 994(m). The Sentencing Commission made this point when it issued the original version of the guidelines:

> The Commission has not simply copied estimates of existing practice as revealed by the data (even though establishing offense values on this basis would help eliminate disparity because the data represent averages). Rather, it has departed from the data at different points for various important reasons. Congressional statutes, for example, may suggest or require departure, as in the case of the new drug law that imposes increased and mandatory minimum sentences. In addition, the data may reveal inconsistencies in treatment, *such as*

> *punishing economic crimes less severely than other apparently equivalent behavior.*

USSG § 1A1.1 (editorial note A–3, reprinting original 1987 introduction to Sentencing Guidelines) (emphasis added).

The Sentencing Commission made this decision to set higher guidelines for environmental offenses. Its decision was public and was consistent with the general instructions from Congress to raise sentences for white-collar economic crimes, especially for purposes of deterrence. See S. Rep. No. 98–225, at 76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3259 (noting that "major white collar criminals often are sentenced to small fines and little or no imprisonment," creating the impression that "certain offenses are punishable only by a small fine that can be written off as a cost of doing business"); *United States v. Rivera,* 994 F.2d 942, 955 (1st Cir.1993) (Breyer, J.) (noting Commission's intent to equalize punishment for white collar and blue collar crime); Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 Hofstra L. Rev. 1, 20, 22 (1988). Over the past 20 years, Congress has had many opportunities to amend or even just to criticize these environmental crime guidelines. It has not done so. The court can reasonably conclude that § 2Q1.2 and other environmental guidelines reflect general congressional policy with reasonable accuracy. Accord, *United States v. Strandquist,* 993 F.2d 395, 399 (4th Cir.1993) (rejecting similar challenge to § 2Q1.3 and affirming guideline sentence of five months in prison for two counts of discharging sewage without permit); *United States v. Ellen,* 961 F.2d 462, 468 (4th Cir.1992) (rejecting similar challenge to § 2Q1.3 and affirming guideline prison sentence of six months for six counts of filling wetlands without permit).

The Foundation also argues that the disparity between the two-year statutory maximum prison sentence for a violation of 33 U.S.C. § 1319(c)(4) and the higher guideline range here helps to show that § 2Q1.2 is unreasonable. The argument is not persuasive. If the defendant had violated § 1319(c)(4) only once, the argument would be more persuasive, but he did not. He was convicted on ten counts based on conduct over many months. The law would have authorized ten consecutive sentences totaling as much as twenty years in prison, rather than the five years the court imposed. See 28 U.S.C. § 994(*l*)(1)(B) (Commission shall insure that guidelines reflect the appropriateness of incremental penalties for multiple offenses committed at different times).

The trial evidence showed that the criminal conduct included essentially the entire way that Mr. Hagerman conducted WET's business during 2004. To keep the trial proof manageable, the government elected to proceed on only ten counts, but in sentencing for those ten counts, the court could take into account the entire course of relevant conduct. See USSG § 1B1.3. The government's evidence and Mr. Hagerman's testimony described two very different versions for handling routine testing and reporting that applied throughout that period covered by the indictment. It is not surprising that, in a case of repeated violations of laws providing for relatively light sentences for each violation, the guideline range for the entire course of conduct is higher than the statutory maximum for any one violation.

In the end, the court concluded that the seriousness of the crimes and the need for significant deterrence for crimes this serious required the relatively heavy sentence of five years in prison. See 18 U.S.C. § 3553(a)(2). The Sentencing Guidelines take account of several of the aggravating factors here, but not all. The environmental crimes here were not a by-product of an otherwise legitimate industrial operation. Defendant WET was in the business of selling wastewater treatment services. Mr. Hagerman had substantial experience in the business. He knew exactly what he was doing and how he was breaking the law. He promoted the business as expert in handling industrial wastewater. The whole business seems to have been built on the premise of fraud. In addition, the systematic, long-term, and cold-blooded character of this environmental fraud is not fully captured by the guidelines.

The two level adjustment under the guidelines for obstruction of justice is not adequate to address Mr. Hagerman's conduct fully. His destruction of documents, his attempt to manipulate the testimony of Ms. Neill, and his repeated perjury at trial each would have been sufficient by itself to justify the adjustment. Mr. Hagerman was responsible for all three attempts to obstruct justice. He has shown no remorse either for his crimes or for these efforts to obstruct justice in his case. On this basis, the court considered a sentence above the guideline range. See *United States v. Shaaban*, 252 Fed.Appx. 744, 2007 WL 3129709 (7th Cir. Oct. 26, 2007) (affirming above-guideline sentence based on multiple efforts to obstruct justice). The court ultimately chose not to impose a higher sentence. In general, the court concluded that the heavy five year sentence was sufficient to serve the purposes of sentencing. In terms of guideline issues, the court also had concerns that the four-level upward adjustment for expensive clean-up under § 2Q1.2(b)(3) might tend to exaggerate the harm involved because the clean-up was a somewhat indirect consequence of the crimes. In the court's mind, the clean-up issue was something of a counterweight for the repeated obstruction of justice.[4]

---

**4.** The discharges of pollutants above permitted levels into the Wabash River could not be

The need for deterrence is especially great in this case because of the nature of the offense conduct and the need for effective criminal sanctions for such blatant and serious violations of the Clean Water Act. The Clean Water Act relies on a system of self-monitoring and reporting. Businesses like WET must test their wastewater. They will sometimes find pollutant levels above permitted levels. If they comply with the law and report the high levels, they will face the prospect of serious and expensive regulatory action. That prospect can present a strong temptation to lie, and not everyone has an inner compass that will lead him to resist the temptation on his own. The managers of those businesses need to understand that if they make the choice that Mr. Hagerman made—to lie and to cover-up the violations on this scale—they face more than fines and civil penalties as a cost of doing business. They face prison.

The Foundation argues that this case involves a "relatively minor reporting offense" that "could have and should have been resolved by more reasonable and effective administrative and civil penalties." Amicus Br. at 1. The court could not disagree more. The offenses here were not minor. They were cold-blooded, deliberate, and repeated decisions to profit from unlawful pollution and to cover-up the crime and obstruct justice, and Mr. Hagerman has shown no remorse at all. If this environmental case were not appropriate for significant criminal sanctions, it is hard to imagine one that would be.[5]

cleaned up. The clean-up costs in this case resulted from the closure of WET and the need to cope with the inventory of wastewater in the company's holding tanks that was waiting to be treated.

5. If Mr. Hagerman had not attempted to obstruct justice and had accepted responsibility for his conduct, his guideline offense level would have been 19. The guideline range for sentencing would have been 30 to 37 months, before consideration of other factors, such as the perhaps excessive guideline effect of the clean-up cost calculation under § 2Q1.2(b)(3) as applied to this case.